# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **Jane Doe, and Individual,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | |
| **State of Oklahoma ex rel.,** ) | |
| ) | |
| **THE BOARD of REGENTS for the** ) | |
| **UNIVERSITY OF OKLAHOMA**, ) | |
| ) | Case No._____ |
| **DAVID A. SURRATT**, in ) | |
| his individual and official Capacity as ) | |
| Vice President of Student Affairs and ) | |
| Dean of Students, ) | |
| ) | |
| **KALYN CAVAZOS**, in her ) | JURY TRIAL DEMAND |
| individual and official capacity as ) | ATTORNEY LIEN CLAIMED |
| Director of Student Conduct and ) | |
| Assistant Dean of Students AND, ) | |
| ) | |
| **TERRY SCHOFIELD**, in his ) | |
| Individual capacity. ) | |
| ) | |
| **Defendants.** ) | |

## **COMPLAINT**

COMES NOW, Jane Doe ("Plaintiff") by and through Plaintiff's attorneys

of Record Rand C. Eddy of Eddy Law, PC, and Sawmon Y. Davani of Davani

Law, PLLC, and brings this lawsuit pursuant to **42 U.S.C. § 1983** because the

federally funded, public university, which Plaintiff attends, and its employees

violated Plaintiff's rights to freedom of speech and due process as guaranteed by

the **First and Fourteenth Amendments** of the United States Constitution, by

1

punishing her for personal, off-campus expression made while seeking mental health assistance. Plaintiff also brings a claim under **Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**, which prohibits discrimination on the basis of disability by recipients of federal financial assistance.

For the causes of action set forth herein, Plaintiff alleges and states the following:

## PARTIES

**Plaintiff, Jane Doe,** was and currently again is a University of Oklahoma Health Science Center ("OUHSC") Medical Student at the Oklahoma City campus; Plaintiff currently resides within the boundaries of the Western District of Oklahoma and is a United States citizen.

**Defendant State of Oklahoma, ex rel. The Board of Regents for the University of Oklahoma ("University")** is a public institution of higher education organized and existing under the laws of the State of Oklahoma, with its principal place of business located in Oklahoma County, within the boundaries of the Western District of Oklahoma, and OUHSC is a part of the University.

**Defendant David A. Surratt ("Surratt")** is, and was at all times relevant to this Complaint, an employee of the University, serving as Vice President for Student Affairs and Dean of Students, and was performing within the scope of his employment under color and authority of state law. Surratt was responsible

for making the final decision in Plaintiff's disciplinary proceedings or "Student Conduct Proceedings" after reviewing the evidence, findings, decision, and sanction of the University's Hearing Panel. Surratt knew or reasonably should have known that the Hearing Panel's decision and his affirmance that Plaintiff violated Section II.4(e) of the Student Rights and Responsibilities Code of Conduct ("Code"), Ex. 1, and any resulting sanction for "threatening behavior" was in violation of Plaintiff's First and Fourteenth Amendment rights as well as her rights under Section 504 of the Rehabilitation Act, and is sued in both his individual and official capacities.

**Defendant Kalyn Cavazos ("Cavazos")** is, and was at all times relevant to this Complaint, an employee of the University, an employee of the University, serving as Director of Student Conduct and Assistant Dean of Students, and was performing within the scope of her employment, under color and authority of state law. Cavazos was responsible for reviewing the evidence and allegations against Plaintiff, determining whether to initiate disciplinary proceedings, imposing a sanction through the University's Office of Student Conduct ("OSC"), and then arguing before the Hearing Panel and Surratt for a sanction if a formal hearing and review is sought by a student. Ex. 2 § II. But if Cavazos determined that the alleged conduct would not violate the Code, then she was to conclude the matter without further proceedings. Id. Cavazos knew or reasonably

should have known that charging and finding Plaintiff responsible for violating Section II.4(e) of the Code as well as seeking her expulsion from OUHSC, Ex. 1 § II; Ex. 3, was in violation of Plaintiff's First and Fourteenth Amendment rights as well as her rights under Section 504 of the Rehabilitation Act, and is sued in both her individual and official capacities.

**Defendant Terry Schofield ("Schofield")** is an employee of the University serving as Deputy Chief of OUHSC Police, and was performing within the scope of his employment, under color and authority of state law. Schofield was responsible for investigating and reporting alleged violations. Schofield knew or reasonably should have known that pursuing this charge was in violation of Plaintiff's First and Fourteenth Amendment rights as well as her rights under Section 504 of the Rehabilitation Act, and is sued in his individual capacity.

## JURISDICTION AND VENUE

This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and Section 504 of the Rehabilitation Act (29 U.S.C. § 794). This Court has original jurisdiction over these federal claims pursuant to **28 U.S.C. §§ 1331 and 1343**.

Venue is Proper in this District under **28 U.S.C § 1391 (b)(1)** because Defendants reside in this district and/or under **28 USC § 1391 (b)(2)** because the

events giving rise to Plaintiff's claims occurred within this District.

## FACTUAL ALLEGATIONS

***University officials wrongfully target and investigate Plaintiff as a suspect for sending anonymous and allegedly defamatory emails, and then penalize Plaintiff for unrelated professional matters discovered in the investigation.***

1.      At all relevant times during 2022 to May 2024, Plaintiff was enrolled as a medical student at OUHSC and was registered with the University's disability accommodations office due to diagnoses of generalized anxiety disorder, major depressive disorder, and Attention Deficit Hyperactivity Disorder (ADHD).

2.      During this period, a series of anonymous and allegedly defamatory emails were circulated among the medical school class. Following a personal dispute between Plaintiff and her former roommate, Plaintiff and members of her social circle became suspects. In June 2023, OUHSC Police initiated an investigation into the emails. Despite a complete lack of evidence implicating her, Plaintiff became the primary focus of the investigation. Plaintiff perceived this as being due in large part to bias from OUHSC's Associate Vice President of Student Affairs and Associate Title IX Coordinator, Kate Stanton, who had a close personal relationship with Plaintiff's former roommate.

3.      On or around August or September 2023, Plaintiff was contacted

by OUHSC Police, coerced into submitting to an interrogation, and compelled to surrender her electronic devices, including an iPad and laptop. An off-duty FBI officer was also present during the interrogation. Plaintiff's devices were returned in October 2023; however, law enforcement retained digital copies of contents. The investigation formally concluded in early 2024, having yielded no evidence of wrongdoing by Plaintiff.

4.      Following the conclusion of the investigation, in or around February 2024, the University began taking retaliatory disciplinary actions against Plaintiff. She was issued a professionalism violation based on information improperly obtained from her devices, namely, a photograph she had taken of her own quiz to help her with her own studying for future assessments, and which was never shared with anyone else. In April 2024, Plaintiff received a second professionalism violation for a photograph she had taken of her own clinical notes on a patient because she was supposed to share that information with the attending physician on rounds and her access to her notes through the internet was not reliable, but this photograph was not sent to anyone else and this is a common practice by attending physicians and residents.

***The University officials' months-long investigation and retaliatory actions cause Plaintiff to suffer anxiety, stress, and depression that eventually results in a mental***

**health crisis where Plaintiff feels suicidal and calls 988 for confidential counseling and help, which 988 then reports to OUHSC Police without Plaintiff's consent or knowledge.**

5.      As a result of the ongoing harassment and retaliatory conduct by the University, Plaintiff experienced a severe mental health crisis. On Saturday, April 27, 2024, she contacted the 988 Suicide and Crisis Lifeline during a panic attack, and she reasonably expected her communications with 988 to be kept confidential.

6.      988 presented itself on its website homepage as a service which "provides free and *confidential* emotional support to people in suicidal crisis or emotional distress." Ex. 4 (emphasis added).[1]

7.      During this confidential conversation, Plaintiff made statements expressing frustration with the University and specific administrators because she was worried that they were trying to improperly remove her from OUHSC and end her medical career.

8.      Without Plaintiff's consent or knowledge, the supervisor or "Senior Contact Lead" with the 988 crisis line for the State of Oklahoma, Jim

---

[1] Currently, 988's website homepage similarly states that "Your conversations are free and *confidential*," and the website's "About 988" page likewise states "The 988 Suicide & Crisis Lifeline provides free and *confidential* emotional support to people in suicidal crisis or emotional distress." https://988lifeline.org/ and https://988lifeline.org/about/ (emphasis added) (visited Sept. 12, 2025).

Black, subsequently contacted OUHSC Police that same night and relayed that Plaintiff "wished that [Kate Stanton, an administrator at OUHSC] would die," and that "she wanted, basically, all the -- the administrative staff at -- at the med school to die." Ex. 5 at 4.[2] But Black explained that Plaintiff did not have "the means" to act on this and "it's kind of a 51/50, but we have a duty to warn you guys. So..." Ex. 5 at 4. (ellipsis in original). In a follow up phone call with OUHSC Police later that night, Black stated that he "think[s] she was just trying to express some feelings of frustration," that "we [988] get a lot of these calls," and "even though we don't think that she was serious about the threats, we just don't want to leave any stone unturned," though "in [Black's] opinion, tonight is not -- she's not -- she's not an immediate threat to herself or anybody else." Ex. 6 at 4-6. Black also clarified that Plaintiff was "talking in terms of like *just wanting* -- she -- she wanted [Stanton] and the OU Medical -- just the whole administrative staff just basically to die"—not that Plaintiff was threatening or planning to kill anyone. Ex. 6 at 9 (emphasis added). .

9.    Even though Black never reported or quoted any alleged threatening statements made by Plaintiff, and rather simply said that

---

[2] Plaintiff never actually said this to 988 though, and that was Black's own (mis)interpretation of what Plaintiff meant and felt.

Plaintiff wished or wanted staff to die (which is not a threat to harm someone) as she was expressing some feelings of frustration, OUHSC Police sent out an email early the next morning to other staff about the report from Black, characterizing it as a matter "regarding a student making threatening statements toward staff members," and claiming that "Black stated [Plaintiff] made some concerning comments about how she wished Stanton was dead. Black also stated [Plaintiff] wanted all of the medical staff members to die. Black advised [Plaintiff] made the comments in general (no plan)." Ex. 7. And even though Black had told OUHSC Police that 988's conversation with Plaintiff "started out on our [988's] text and chat program" and that "we [988] have a voice recording of everything that she discussed and stated," Ex. 5 at 2, 5, the University never obtained or sought to obtain any of these texts or recordings from 988 to see what Plaintiff actually said.

***Four days later, Defendant Schofield contacts and enlists a 988 counselor to act as a de facto undercover police informant to call and elicit statements from Plaintiff under the guise of a follow-up wellness check, even though Schofield acknowledges that Plaintiff's statements were not threats and were protected "free speech."***

10.    On Wednesday, May 1, 2024—four days after Plaintiff had called 988 and been on campus that week without any incident—Deputy Chief of OUHSC Police Terry Schofield, who is also affiliated with the University's TARC (Threat Assessment Review Committee), a decision-

making branch, contacted 988 to discuss Plaintiff's April 27th call without Plaintiff's consent or knowledge. In Schofield's conversation with 988 counselor Joy, Schofield discussed Plaintiff's alleged statements and said: "I'm looking at it as a police officer, and I'm saying, okay, saying [']I wish someone was dead,['] even though that is ugly and not right to say, *it's not…a threat*…it's not hate speech, *it's free speech*." Ex. 8 at 10-11 (emphasis added). Schofield therefore acknowledged that "there's nothing I can compel her to bring her in to have a conversation with her about what she said *because there was no crime committed*." Ex. 8 at 16 (emphasis added). Schofield and 988 counselor Joy also discussed that Plaintiff "[had] no plan" or "means" to carry out any harm and was "stable." Ex. 8 at 11, 17.

11.    Schofield also unnecessarily disclosed to the 988 counselor that Plaintiff had been under investigation as one of the suspects for allegedly sending anonymous emails to other students, even though Plaintiff was never found in violation or charged for that, and Schofield himself described it as "nothing serious, nothing violent." Ex. 8 at 11-16.[3] Schofield explains, though, that the investigation led to conduct violations for other matters and that Plaintiff was worried she was going to be

---

[3] Plaintiff disputes Schofield's allegations about this.

removed from OUHSC, but stated that "nothing is going to happen to her. I mean…I've already confirmed that. They're just going to let her go on." Ex. 8 at 15-16.

12.    Schofield then disclosed Plaintiff's mental health diagnoses, including general anxiety, PTSD, ADHD, and major depressive disorder. Ex. 8 at 16. And he disparaged Plaintiff's character, claiming that "she hates the police, she's just paranoid," and that he "wouldn't want her as [his] doctor." Ex. 8 at 18.

13.    Despite knowing that Plaintiff posed no threat and committed no violation, Schofield requested that 988 counselor Joy follow up with Plaintiff under the pretext of a wellness check and report back to him, to which 988 counselor Joy agreed. Ex. 8 at 19, 11-21. During the follow-up call from Joy to Plaintiff later that day, instead of trying to help or counsel Plaintiff, the counselor questioned Plaintiff about her *past* emotional state days earlier—back on April 27th when Plaintiff first contacted 988—to draw out specific details to report back to Schofield per his request. Ex. 9 at 8-9, 12.

14.    Plaintiff, again thinking that this conversation with 988 is confidential and having no knowledge of OUHSC involvement, explained that the thoughts she had experienced at that time—such as what Plaintiff

described then as "taking administrators with [her]" or wanting to "yeet off the planet and yeet them too"—were past feelings which Plaintiff "*was having that day*" (i.e., April 27th), not current feelings or intentions, and clarified that she was no longer in a similar emotional state. Ex. 9 at 9 (emphasis added). Plaintiff had indicated that she wished the University to be held accountable through legal or reputational consequences, and that she did not want to go "three feet within [Stanton]." Ex. 9 at 4, 6-7, 9. When asked how she currently felt "right now" on May 1st, Plaintiff simply stated "I'm annoyed.". Ex. 9 at 12. Plaintiff would never have made these statements on May 1st if not prompted by the 988 counselor, who had been directed by Schofield to call Plaintiff.

15.     The 988 counselor relayed information of her conversation with Plaintiff back to Schofield as he had requested. Plaintiff in her follow-up conversation made it clear that "the administrator in higher education [was] directly targeting [her] through a legal and criminal issue that she's very tempted to go to the news about." Ex. 9 at 2. Plaintiff's comment regarding the news was regarding posting to the news "everything that [the administrator's] ever done". Ex. 9 at 9. Terry Schofield was informed about this.

16.     No alerts were issued and Plaintiff remained on campus without

incident between April 27 and May 1, 2024. Upon hearing the follow-up call from the 988 counselor, Terry Schofield, despite knowing that his police department utilized an off-duty FBI officer to investigate Plaintiff during the September 2023 interrogation, asked the 988 counselor to issue a protective custody statement and characterize Plaintiff as paranoid. He asks the 988 counselor to do so by "establishing the paranoia, how she's talked about the FBI, all this stuff, all this paranoia" to ensure that the statement is not "too vague" and "really doesn't give [him] what [he] needs" Ex. 10 at 11. Notably, an actual threat to others alone would be a permissible sole basis for placing someone in protective custody per Oklahoma mental health law. This request from Schofield leads Oklahoma City Police to conduct a welfare check at Plaintiff's apartment, where ultimately the police department declined to place the plaintiff in protective custody and acknowledge that in their professional judgement, she did not pose a danger to herself or others.

17.    "She's saying that she calmed down she's not suicidal, homicidal, you know, she knows where she's at, she's not out of - you know, she's not - she's not in a bad place of mind right now, et cetera; she's just very frustrated with the staff there. So for us, we don't really have enough for an officer's affidavit to  take her into protective custody... we checked the

welfare, she's fine." (Ex. 11 at 5-6).

18.      Shortly after the Oklahoma City Police department provided Schofield an update regarding the findings of the welfare check. 988 and Oklahoma City Police agreed that the Plaintiff would not need to be placed in protective custod. Unsatisfied with 988 and OKC PD's professional judgment, Terry Schofield calls Tony Stelter, the director of client operations at 988, to escalate the situation within 988 to attempt to place Plaintiff in protective custody. Tony Stelter connects him with Angie Marino, a former colleague (Ex. 12 at 4-5), who writes a protective custody statement. Marino did not supervise or take any calls personally from Plaintiff. Joy's initial supervisor also did not agree with protective custody. Ex. 12 at 4-8.

19.      Oklahoma City Police acknowledged that even though Marino wrote a protective custody statement, that they would still not be able to take Plaintiff into protective custody (Ex. 13 at 2-5) and at most could stand by because they did not personally judge Plaintiff to be a threat. Terry Schofield later misrepresents these events at the hearing, stating that  "He [the OKC PD officer] had talked to Joy. He agreed that there should be a protective custody," when this was not OKC PD's opinion (Ex. 14 at 62).

***Defendant Cavazos punishes and expels Plaintiff by mischaracterizing her alleged statements to 988 as "threatening behavior."***

20.     Schofield then shared the info from 988 with the University's Threat Assessment Review Committee (TARC), which he is a member of and which then notified the OUHSC's Behavioral Intervention Team (BIT) that same day. Michael Harrington, the Chair of BIT and the OUHSC Director of Student Affairs, significantly distorted and mischaracterized the information and Plaintiff's alleged statements. That same day, Harrington reported that OUHSC "received a second Duty to Warn phone call from a 988 operator" (which was not true because 988 initiated the call to Plaintiff, and then reported back to Schofield as part of a coordinated effort), that Plaintiff "indicated a plan" (which was also not true), and that "[Plaintiff] said she would broadcast to all colleges of medicine her coming to campus and killing the administration and killing herself" (which was not true either, as Plaintiff never said she was going to kill anyone). Ex. 15. Indeed, during his testimony at the University's Hearing Panel, Harrington admitted that it was his personal speculation that the word "yeet" meant "kill." Ex. 14 at 96-97.[4] Although no previous alerts were

---

[4] Exhibit 14 is a transcript of the University's June 4, 2024 student disciplinary conduct proceeding against the Plaintiff before the University's Hearing Panel. As explained in the University's Code Procedures, "The University may audiotape any conduct proceeding, which will be the official record of the proceedings." Ex. A § IV. The University made a video recording of this proceeding, Ex. 14 3-4, and Plaintiff had that recording transcribed.

issued and Plaintiff was on campus without incident between April 27 and May 1, 2024, see Ex. 14. at 33, 68, 73, 127, 144, because of Harrington's inaccurate report and distortion of Plaintiff's statements, Harrington and/or the University sent nonessential OUHSC Student Affairs staff home from the Student Union building, restricted access to the building, and cancelled an optional graduation event for seniors to take pictures that evening near the building. Ex. 14 at 81. The University, however, did not close down campus or send students home, and Stanton remained on campus.

21.    Additionally, the University is trained and certified by the National Behavioral Intervention Team Association (NABITA), which provides comprehensive training in threat assessment protocols, including the SIVRA-35 threat assessment. Despite possessing this training and established protocols to appropriately handle situations, the University elected not to implement the threat assessment process in this case, see Ex. 14 at 92, which thereby avoided generating medically supported evidence that Plaintiff's conduct did not constitute a threat. By knowingly failing to follow the NABITA-established protocols, the University treated Plaintiff differently than other individuals in similar circumstances, thereby subjecting her to discriminatory treatment.

22.    That evening, OUHSC Police served Plaintiff with a Notice to

Vacate Campus and notified her of an interim suspension and a trespass warning under a Direct Administrative Action issued by Defendant Cavazos as the University's Director of Student Conduct for alleged threatening behavior in violation of Section II.4(e) of the Student Code due to her statements to 988 on April 27, 2024. Ex. 14 at 18, 137; Ex. 22. Following the notice, Plaintiff experienced a renewed mental health crisis and voluntarily sought treatment at HOPE Urgent Recovery Center out of concerns for self-harm because she felt and stated that she had nothing to live for after being removed from OUHSC. Ex. 14 at 138. Plaintiff was at HOPE from May 1 to May 3, 2024.

23.     While at HOPE, Cavazos sent Plaintiff a notice on May 2, 2024 that an intake meeting would be taking place the next morning, did not provide any option for rescheduling, and stated that "[f]ailure to attend your intake meeting…may result in additional student conduct charges and/or result in a default decision on your case." Ex. 14 at 18; Ex. 16. The next morning, on May 3, 2024, shortly after Plaintiff's release from HOPE, Plaintiff met via Zoom with Cavazos, Dr. Craig Cruzan (head of University Counseling), and Deputy Chief Schofield. Ex. 14 at 140. Per Cavazos, Plaintiff explained at the intake meeting that "she did not know this information [about her comments to 988] would be shared and thought that

the call would be kept private since it was a mental health crisis line," that "she did not have the means" to cause any harm, and that she made her statements "out of frustration." Ex. 14 at 18-19..

24.  Despite these explanations, University officials continued to treat Plaintiff as a threat and escalated disciplinary proceedings. On May 7, 2024, Plaintiff was informed via Zoom and a letter by Cavazos that the University's Office of Student Conduct "found [her] responsible for violating" Section II.4(e) of the Student Code which prohibits "threatening behavior" defined as "A serious expression of intent to commit an act of unlawful violence against a particular individual, identifiable group, or damage to property. The threatening violence, including intimidation, causes reasonable fear of injury to the health or safety of any person, group, or property." Ex. 3; Ex. 14 at 19-20. Cavazos said that the meeting was also "to inform [Plaintiff] of *my decision* to expel her from the University," Ex. 14 at 20 (emphasis added), and Cavazos's letter detailed the "sanctioning decision" of expulsion effective that day, May 7, 2024, Ex. 3.

***Defendants Cavazos and Schofield present allegations and claim to a University Hearing Panel that Plaintiff's alleged statements to 988 constituted "threatening behavior" and warrant expulsion.***

25.  Plaintiff appealed and requested a formal hearing where a panel would decide whether Cavazos's decision to expel should be upheld based

on a preponderance of the evidence. Ex. 14 at 20, 162; Ex. 2 § III. On June 4, 2024, a Hearing Panel of the University conducted a disciplinary hearing where Cavazos argued that Plaintiff violated Section II.4(e) of the Student Code for her statements made to 988 on May 1, 2024 and should therefore be expelled. Ex. 2 § III; Ex. 14 at 19-20. Cavazos stated to the Hearing Panel, "I have to deal with threats to our campus community more often than I'd like to, and they are typically tied to a person experiencing mental distress," Ex. 14 at 20, which indicates possible bias and discriminatory treatment toward those, like Plaintiff, who are diagnosed with certain mental health conditions making them more likely to experience distress.

26.     Cavazos had Schofield testify as a witness. Ex. 14 at 31-37, 56-73. Cavazos also played a recording of 988 counselor Joy's statements to Schofield about her call with Plaintiff on May 1st, Ex. 14 at 26-30, 40-56, but Cavazos did not have the 988 counselors Joy or Black there to testify. And even though Joy had told Schofield multiple times that Platiniff's conversations and actual statements with 988 were recorded and obtainable, Ex. 14 at 53-54, neither Cavazos, Schofield, or anyone else at the University ever sought to obtain them, and therefore did not present them at the hearing. Ex. 14 at 39.

27.     Thus, Cavazos presented only multi-layered hearsay evidence

that Plaintiff made the following statements to 988 as the sole basis for the "threatening behavior" violation:

- **On April 27, 2024**, OUHSC Police claimed that the 988 supervisor Jim "Black stated [Plaintiff] made some concerning comments about how she *wished* Stanton was dead. Black also stated [Plaintiff] *wanted* all of the medical staff members to die. Black advised [Plaintiff] made the comments in general (*no plan*)." Ex. 7 (OUHSC Police email presented by Cavazos as exhibit A to the Hearing Panel (see Ex. 14 at 16-17)) (emphasis added). Schofield likewise testified about this OUHSC Police email, which was written by another police officer, and stated that "[Plaintiff] had made some concerning remarks that she had *wished* the medical school staff dead and that she also *wished* Kate Stanton dead," Ex. 14 at 32, but Schofield also clarified that "[Plaintiff] didn't say [']I'm going to kill Kate Stanton.['] She said, [']I wish Kate Stanton was dead,[']" Ex. 14 at 69 (emphasis added).[5]

---

[5] However, it should again be noted that 988 supervisor Jim Black never said that Plaintiff herself *said* she wished anyone was dead—he just explained that Plaintiff *wished* or *wanted* certain people to die or be dead, and he apparently based this conclusion on his speculation, misinterpretation, and mischaracterization of what Plaintiff was feeling or thinking. See Ex. E; Ex. F. Indeed, Plaintiff did not actually

- **On May 1, 2024**, in a phone conversation recorded by Schofield, the 988 counselor Joy reported the following claims to Schofield after speaking with Plaintiff earlier that day at Schofield's direction:

  > [Plaintiff] said -- whenever I asked her, due to her frustrations, if she was having any thoughts of harm, she said *she has nothing to do it with*. And then she said that she *wanted* to end it all at the school and, five minutes before, post it to the news and publish it to all medical schools and take the administrators with her. And then I asked for clarification on what she meant when she said take the administrators with her, and she said she *wanted* to yeet off the planet and yeet them all too. …. And then she said, I *want* her to pay in one way or another.

  Ex. 14 at 41-42 (recording of phone presented by OSC at the Hearing as exhibit L (see Ex. 14 at 26, 40)) (emphasis added).[6]

---

make those statements, and testified to that before the Hearing Panel. Ex. 14 at 124-126.

[6] Cavazos also presented the May 1st email from Michael Harrington (Ex. 15, presented as Exhibit B to the Hearing Panel) which falsely claimed that "[Plaintiff] said she would broadcast to all colleges of medicine her coming to campus and killing the administration and killing herself." Ex. 14 at 17. But Harrington later admitted on cross-examination that this was not a quote of Plaintiff's words and that he got the word "killing" from his "[u]nderstanding of what was meant by yeet," and affirmed this was only his "*assumption* of how [Plaintiff] used the word yeet." Ex. 14 at 96-97 (emphasis added). Harrington also could not explain any basis for his statement in the email that Plaintiff had "indicated a plan," id., and other records and Plaintiff's own testimony clearly stated that Plaintiff had no actual plan, means, or intent, see, e.g., Ex. 7, Ex. 14 at 132-133, 144.

28.     Cavazos also presented two screenshots of text messages between Plaintiff and 988 from April 27th, which Plaintiff had provided earlier to OSC. Ex. 14 at 17. In the first screenshot, Plaintiff simply answered 988 that she had not been drinking alcohol that day because she was basically paralyzed by her emotional state of panic and anxiety. Ex. 17. In the second screenshot, which preceded the first screenshot in the conversation, Plaintiff had expressed to 988 that she was having feelings of self-harm by saying "I want to rip my head off; leave a note to the news at the school and let them know that it's this place's fault and destroy this school in the process" (Plaintiff also testified to this at the hearing and explained that by "destroy" she meant "I really wanted them to know that, if anything were to happen to me, if I were to hurt myself, I just wanted people to know that it was because of all of these pressures from school," Ex. 14 at 123-124), and the screenshot begins with 988's response to that statement, asking "Is this something you are actually thinking about donig [sic]," to which Plaintiff explained that she had no means to do that, did not have the energy to get off her floor, and was "just very fucking upset." Ex. 18.

29.     Cavazos then called Schofield to testify before the Hearing Panel. Schofield was, at the least, somehow confused about the timing of these

events and the dates between Plaintiff's two conversations with 988 as being four days apart, but when he was questioned by the Hearing Panel about any contact or issues with Plaintiff having been on the University's campus that Monday (April 29th), Tuesday (April 30th), and Wednesday (May 1st) following Plaintiff's first conversation with 988 the Saturday beforehand (April 27th), Schofield knew of no concerns or contacts with Plaintiff. Ex. 14 at 33, 68, 73; see also id. at 127, 144. And when Schofield was questioned on cross-examination if he "did not believe that [Plaintiff] had weapons or means in the house to harm anyone else," Schofield acknowledged that Plaintiff did not appear to present any risk when he gave the following response:

> [Plaintiff] said to 988 she had nothing to harm herself with, and she made no statements to anyone else that I know of that give any indication that she had weapons in the house. So the answer would be no. We would have no articulable reason to even think of a search warrant.

Ex. 14 at 64. Also, despite knowing from the 988 counselor that plaintiff made statements about going to the news media in reference to the illegal seizure of her electronics, Schofield claimed at the hearing that, "from just training and experience from mass shootings or things like that, some of those people have the tendency of live streaming it or posting it. So that kind of made me feel like this could be more credible then initially thought when

it's come to posting such an event, like she was trying to express that she was wanting to do." Ex. 14 at 35.

30.    In her closing, Cavazos claimed that "[t]he University has a student code of conduct put into place to ensure that students are given clear notice of what behavior is not tolerated." Ex. 14 at 153. Cavazos continued advancing the false narrative that Plaintiff made "violent statements regarding *killing* and broadcasting a *killing* of university administration," Ex. 14 at 155 (emphasis added), when there was no evidence that Plaintiff ever used or meant the term "kill." In referring to Scholfield's misrepresentation she emphasized, "for this Wednesday , May 1st call, that's where she essentially doubled down on the articulated plan of alerting the medical school, streaming it on media, and yeeting herself off and others,". Ex. 14 at 39. Cavazos inappropriately played to the Hearing Panel's personal emotions and guilt in calling on the Panel to "[i]Imagine if a similar incident happened in your college or department and how you would like the proper channels to respond," Ex. 14 at 153, and stating that "I want the panel to consider [Plaintiff's] words and what message the University would send to its administration and students if we did not enforce the very code of conduct to which it holds all students," Ex. 14 at 154. Cavazos then told the Panel that it can both "agree with

[Plaintiff's] counsel that she was experiencing a mental health break and find based on preponderance of the evidence that it was appropriate for the University to expel [Plaintiff] based on her threats made on two occasions to either cause harm or kill university administration." Ex. 14 at 155.

31.     Plaintiff also testified in her own defense before the University's Hearing Panel, which provided the only direct and non-hearsay evidence about what was actually said and the context of those statements. Plaintiff explained that on April 27th when she first called 988, she was having a "mental breakdown," "panic attacks," "thoughts of wanting to hurt [her]self and a lot of frustration with the school at the time." Ex. 14 at 120-121. So, she called 988 for help and thought her conversation and statements with 988 were confidential and would not be disclosed to anyone at the University. Ex. 14 at 145, 161. Plaintiff stated multiple times that she never told 988 that she wanted to kill or harm Stanton, that she wished anyone was dead, or that she had a plan or was going to do anything to physically harm another person. Ex. 14 at 124-126, 132-133, 144. Instead, Plaintiff made clear to 988 on both dates that she had no plan, no access to a gun or other means of harm, but was just frustrated and was not going to harm anyone. Ex. 14 at 126, 132-133.

32.     Regarding the April 27th conversation with 988, Plaintiff testified

she made statements that "I am so tired and done; I want to rip my head off; leave a note to the news at the school and let them know that it's this place's fault and destroy the school in the process." Ex. 14 at 123. Plaintiff explained that by "destroy" she meant "I really wanted them to know that, if anything were to happen to me, if I were to hurt myself, I just wanted people to know that it was because of all of these pressures from school." Ex. 14 at 124. Plaintiff further stated that she explained to 988 that "I've already invested so much into this [medical school and career]. I'm -- if I'm done, like I wish that everyone was done also, meaning if my career's gone, I want everyone's gone too." Ex. 14 at 125-126.

33.    Regarding the May 1st phone call from 988 counselor Joy, Plaintiff stated that Joy asked her about "what happened Saturday [April 27th]" and Plaintiff had "reiterat[ed] a little bit about what was said Saturday." Ex. 14 at 130. Thus, similar to what Plaintiff told 988 previously on April 27th, Plaintiff told 988 that back on that Saturday she was feeling like "I want to end it all at the school, five minutes before post it to the news, tell other med schools, and take the administration with me." Ex. 14 at 130-131. Plaintiff noted that the phrase she used was "I want to yeet off the planet and yeet them all too," and explained "[w]hat I really meant by that is I'm so frustrated right now I want to -- basically I wish I

could just not exist, but if I -- something happens to me or if I hurt myself, to let the news and medical schools know that it's because of this place." Ex. 14 at 131. While she did not mention Stanton by name, Plaintiff also expressed to 988 having felt "that I want her to pay in one way or another," and explained that "meant I'm so frustrated that all these things keep happening, and I think she's behind it, so I want her to lose her career, lose her reputation, like I want to expose her." Ex. 14 at 131-132.

34.     Plaintiff summarized in closing by stating the following:

> during the mental health emergency…I never had…intentions to hurt anyone. I called 988 to help myself when I had nowhere else to turn and never thought that this would happen. I called them to confidentially deescalate the intrusive thoughts, not to make threats. While I know there are better ways to word frustration, in the middle of a mental health emergency, I just said what came to mind. I'm not a violent person. I feel like I've been misunderstood by everyone that I asked for help from. Now my career in seven plus years of higher education is on the line. I didn't call the school to make threats. I called 988 to help.

Ex. 14 at 161.

35.     Under the University's Code Procedures, the "Hearing Panel [is to] consider the facts presented and assess the credibility of those providing information." Ex. 2 § III. The Hearing Panel necessarily found the Plaintiff credible because, contrary to the statements by Cavazos, Schofield, and Harrington, the Panel's June 7, 2024, decision letter stated that the "panel

did not find compelling evidence to believe that [Plaintiff] used the word

'kill' *or implied the word 'kill' at any time*." Ex. 19 (emphasis added). The

letter further stated that the "panel finds that the testimony and

documentary evidence showed that [Plaintiff] was in an emotional crisis,

and she was using the tools available to her to stay safe." Ex. 19.

Nonetheless, the panel found Plaintiff in violation of Section II.4(e) of the

Student Code, but reduced Cavazos's sanction of expulsion to a one-year

suspension. Ex. 19.

***Defendant Surratt upholds Plaintiff's suspension sanction even though the Hearing Panel did not find that Plaintiff used or implied the word "kill," and there was no evidence that Plaintiff recklessly made any threat.***

36.     Unsatisfied with the panel's one-year suspension sanction,

Cavazos appealed the Hearing Panel's decision to the University Vice

President for Student Affairs and Dean of Students, Defendant David

Surratt. Ex. 20. Cavazos persisted in arguing that Plaintiff used the word

"kill," even though that was not shown in the evidence, and claimed that

"a mental health defense [is] not sufficient to overcome…the obligation of

the University to hold students who make threats accountable." Ex. 20.

Cavazos sent Surratt a link to a video recording of the hearing along with

all of the exhibits, and stated that the "Student Conduct Office requests that

the initial expulsion determination be upheld." Ex. 20. Plaintiff also

appealed, "argu[ing] that the evidence did not support a finding that OUHSC administrators considered her statements to constitute threatening behavior." Ex. 21.

37.    Even though Surratt stated that he "read the appeals from the parties, the hearing panel decision, the evidence that was admitted by the panel, and...watched the recording of the 3.5 hour hearing," he nevertheless concluded "that [Plaintiff] made multiple statements that would be – and were in fact – considered threats," and therefore "affirm[ed] the sanction of suspension for a period of one year." Ex. 21.

**Plaintiff suffers significant injuries and damages because of Defendants' unconstitutional and unlawful actions.**

38.    As a direct result of the University's actions, Plaintiff was suspended from the medical school and her education has been delayed by at least one year. After the suspension was over, Plaintiff resumed her enrollment as a medical student at OUHSC, starting her fourth year at medical school, and is now at the stage where she has to apply for residency. Her chances of getting a match or being accepted for a residency, especially one which she desires, is significantly, if not entirely, damaged by having this student conduct violation and resulting suspension on her school record which will have to be reported in her residency application materials. Even without the suspension on her record,

Plaintiff's chances of getting a desirable residency are still damaged by the one-year gap in her medical schooling due to the suspension at the end of her third year. Because Plaintiff essentially has to apply for residency by early October 2025 to have a somewhat decent chance of matching, if this suspension is not removed from her school record beforehand, Plaintiff might need to seek to delay her graduation so that she can also delay applying for residency until the Fall 2026 semester in hopes of eventually having this suspension removed from her school record by then. But delaying her graduation, for which she might have to pay additional tuition, and thereby creating a second gap in her medical schooling will further harm her chances of matching or being accepted for a residency which can affect the rest of her medical career, especially if she does not get a desired residency or any residency.

39.    Additionally, Plaintiff's speech has been chilled by the University's punitive and disciplinary actions against her. Plaintiff is now fearful and cautious about seeking mental health counseling and treatment from anyone other than a provider whom she knows well and feels she can trust. For example, Plaintiff would never call 988 again since she fears the University might seek to punish her for her speech.

40.    Plaintiff also had to hire a defense attorney to represent her

before the Hearing Panel, obtain the 988 call recordings, and seek to negotiate with the University's general counsel.

41. Thus, as a direct and proximate cause of Defendants' actions, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, injury to her reputation, and significant financial costs. Plaintiff's future as a medical professional has been destroyed by the unconstitutional actions of Defendants. And Plaintiff continues to experience emotional distress because she fears the Defendants and other University officials will seek to impose disciplinary sanctions in retaliation for her speech.

## CAUSES OF ACTION

This complaint arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), which prohibits discrimination on the basis of disability in programs and activities receiving federal financial assistance. At all times relevant to this Complaint, Plaintiff was and currently is a student at OUHSC, which is a public university and a recipient of federal funds. Defendants' actions punished Plaintiff for constitutionally protected speech made in the context of a confidential mental health crisis call, in violation of the First Amendment. Additionally, the University's application of Student Code Section

II.4(e) was unconstitutionally vague and overbroad as applied to Plaintiff, and the absence of fair notice or a meaningful opportunity to challenge her suspension violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment. Further, Plaintiff was denied reasonable accommodations in violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) despite documented disabilities including Attention Deficit Hyperactivity Disorder (ADHD), Major Depressive Disorder, and Generalized Anxiety Disorder.

### Count I – Violation of the First Amendment: Freedom of Speech (42 U.S.C. § 1983)

42.  Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

43.  Plaintiff engaged in constitutionally protected speech during two confidential mental health crisis calls on April 27, 2024, and May 1, 2024, expressing emotional distress and frustration without making any true threat or unlawful statement.

44.  The U.S. Supreme Court has narrowly limited the scope of what constitutes "true threats" by defining them as "*serious* expressions conveying that a speaker *means to* commit an act of unlawful violence." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (cleaned up) (emphasis added).

45. Plaintiff's speech (whether actual or alleged) to a confidential 988 mental health crisis counselor, expressing her feelings of frustration and depression in seeking help while making explicitly clear that she had no plan, intent, or means to actually cause any harm, did not constitute a true threat or serious expression conveying that Plaintiff meant to commit an act of unlawful violence. As noted previously, the University's Hearing Panel, which determines the credibility of the witnesses, Ex. 2 § III, "did not find compelling evidence to believe that [Plaintiff] used the word 'kill' or implied the word 'kill' at any time." Ex. 19; and Defendant Schofield acknowledged regarding Plaintiff's statements that "it's not…a threat… it's free speech." Ex. 8 at 10-11 (emphasis added). Nevertheless, Defendants punished Plaintiff based on her speech, which did not constitute true threats, and thus violated Plaintiff's First Amendment rights to the freedom of speech.

46. Even if any of Plaintiff's statements to 988 constituted true threats, they were still protected under the First Amendment. The U.S. Supreme Court clearly established in 2023, and thus prior to all of these events, that in order to penalize someone based on threatening speech, government officials "must show that the [speaker] consciously disregarded a substantial risk that his communications would be viewed as

threatening violence"—i.e., government officials must establish that the speaker had a subjective *mens rea* of recklessness, which is in contrast to a mere objective negligence standard. *Counterman v. Colorado*, 600 U.S. 66, 69, 79 & n.5 (2023). This burden on the government applies even when "school administrators…discipline individuals who make true threats," and the subjective recklessness standard "can make all the difference in some cases," including when a "delusional speaker may lack awareness of the threatening nature of her speech." *Id.* at 120 (Barrett, J., dissenting).

47. The Hearing Panel found and stated "that the testimony and documentary evidence showed that [*Plaintiff] was in an emotional crisis*, and she was using the tools available to her to stay safe." Ex. 19 (emphasis added). Those tools involved calling the 988 Suicide and Crisis Lifeline for "*confidential* support," Ex. 4 (emphasis added), and Plaintiff made clear in both calls that she had no plan, intent, or means to harm anyone, Ex. 7 ("Black advised [Plaintiff] made the comments in general (*no plan*)." (emphasis added)); Ex. 18; Ex. 14 at 41 (recording of 988 counselor Joy states "[Plaintiff] said -- whenever I asked her, due to her frustrations, if she was having any thoughts of harm, *she said she has nothing to do it with*." (emphasis added)).

48. Plaintiff thus had no subjective understanding of any potential

threatening nature of her speech and did not consciously disregard a substantial risk that her communication/speech would be viewed as threatening violence or would ever be reported to OUHSC. Plaintiff never communicated any threatening statements to any member of the University, nor did Plaintiff ever intend or even expect her confidential statements to be repeated by 988 to the University; rather, Plaintiff clearly intended and expected the opposite—that her statements would be kept confidential.

49. Nevertheless, Defendants used those statements as the sole basis for disciplinary action, including suspension from OUHSC.

50. The Defendants' application of Student Code Section II.4(e) to Plaintiff's speech constituted an impermissible content-based and viewpoint-based restriction on free expression or failed to meet the required subjective recklessness *mens rea* standard for punishing true threats.

51. Defendants' actions were not narrowly tailored to serve a compelling interest and lacked the procedural safeguards required under the First Amendment.

52. As a direct result, Plaintiff suffered a loss of constitutional rights, emotional distress, reputational harm, educational disruption, and financial loss in excess of $75,000. Plaintiff is entitled to an injunction forcing Defendants to remove this suspension and any reference to these

disciplinary actions and proceedings from her record and preventing any the Defendants from taking any future disciplinary action based on her statements to 988.

53.    Surratt's, Cavazos's, and Schofield's actions were intentional and willful, and/or recklessly and callously disregarded and were indifferent to Plaintiff's First Amendment rights, entitling Plaintiff to punitive damages.

### Count II – Violation of the First and Fourteenth Amendments: Vagueness (42 U.S.C. § 1983)

54.    Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

55.    As applied to the Plaintiff, the University's Student Code Section II.4(e) is vague in violation of the First and Fourteenth Amendments.

56.    The First and Fourteenth Amendments prohibit restrictions on speech which fail to provide members of the public fair notice of prohibited conduct. A vague regulation could violate due process for either of two reasons, both of which apply here: when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "When speech is involved, rigorous adherence to [due process] requirements is

necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–254. Consequently, where a regulation's "scope…is capable of reaching expression sheltered by the First Amendment, the [due process] doctrine [of vagueness] demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 572-573 (1974).

57.    The University's Student Code Section II.4(e), which prohibits "threatening behavior"—defined as "A serious expression of intent to commit an act of unlawful violence against a particular individual, identifiable group, or damage to property. The threatening violence, including intimidation, causes reasonable fear of injury to the health or safety of any person, group, or property." Ex. 3—failed to provide Plaintiff with sufficient or fair notice that her statements made in confidence to 988 when seeking mental health counseling would constitute a violation. The Student Code Section similarly fails to provide sufficient precision and guidance so that those enforcing the policy do not act in an arbitrary or discriminatory way.

58.    Having such a broad and unforeseeable scope which invites, causes, and is used to facilitate content-based or viewpoint discrimination, the Student Code Section chills Plaintiff (and likely other students of the University) from engaging in protected First Amendment speech and

seeking mental health counseling.

59.     As a direct result of the unpredictable application of this vague Student Code Section, Plaintiff suffered a loss of constitutional rights, emotional distress, reputational harm, educational disruption, and financial loss in excess of $75,000.

60.     Plaintiff is entitled to an injunction forcing Defendants to remove this suspension and any reference to these disciplinary actions and proceedings from her record and preventing any the Defendants from taking any future disciplinary action based on her statements to 988.

61.     Surratt's, Cavazos's, and Schofield's actions were intentional and willful, and/or recklessly and callously disregarded and were indifferent to Plaintiff's First Amendment rights, entitling Plaintiff to punitive damages.

### Count III – Violation of the Fourteenth Amendment: Procedural Due Process (42 U.S.C. § 1983)

62.  Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

63.  The Fourteenth Amendment to the U.S. Constitution guarantees due process before a person may be deprived of liberty or property interests, including the right to pursue higher education and professional licensure.

64.  Plaintiff had a protected interest in her continued enrollment in

medical school, including her academic standing, reputation, and ability to complete her education.

65. The University deprived Plaintiff of this interest without constitutionally adequate procedures.

66. Plaintiff was denied meaningful opportunity to be heard prior to her suspension. The University relied on hearsay, distorted summaries, and failed to provide Plaintiff the opportunity to cross-examine key witnesses, including Title IX Coordinator Kate Stanton, who had a clear conflict of interest.

67. The University failed to provide a neutral decisionmaker.

68. The University's reliance on confidential medical information, obtained through deceptive coordination with 988 counselors, further violated Plaintiff's privacy and due process rights.

69. As a direct result of these due process violations, Plaintiff was unjustly expelled, suffered reputational harm, emotional distress, and incurred financial losses due to delayed graduation and medical licensing.

## Count IV – Violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794)

70. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability by programs or activities receiving federal financial

assistance.

71. At all relevant times, Plaintiff was a qualified individual with disabilities, including Attention Deficit Hyperactivity Disorder (ADHD), Major Depressive Disorder, and Generalized Anxiety Disorder, each of which substantially limits one or more major life activities.

72. Plaintiff was registered with the University of Oklahoma Health Sciences Center's disability accommodations office and had been approved for academic accommodations.

73. The University is a recipient of federal financial assistance and therefore subject to the requirements of Section 504.

74. Rather than engaging in an interactive process or providing reasonable accommodations when Plaintiff experienced disability-related distress, the University penalized Plaintiff for behavior that was a manifestation of her disabilities—specifically, her statements during a confidential call to the 988 Suicide and Crisis Lifeline during a mental health crisis.

75. University officials failed to make any individualized assessment of Plaintiff's risk, instead relying on mischaracterizations and unfounded assumptions based on her mental health diagnoses.

76. Plaintiff was subjected to harsher scrutiny, disciplinary

procedures, and ultimately suspension based on stereotyped notions of dangerousness related to her disabilities.

77.    These actions constitute intentional discrimination and failure to accommodate in violation of Section 504 and directly resulted in Plaintiff's exclusion from educational benefits and services.

78. As a proximate result of University's actions, Plaintiff suffered emotional distress, reputational harm, and educational delay.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against the Defendants and provide Plaintiff the following relief:

79.    Enter a Temporary Restraining Order followed by a preliminary and permanent injunction directing the Defendants to immediately expunge and permanently remove all documented notations, records, and any other materials related to this incident and suspension from the Plaintiff's educational and personal records, not to report this suspension on Plaintiff's application materials for residency, to list Plaintiff as having an excused leave of absence instead of a suspension, and not to pursue future disciplinary action against Plaintiff based on these statements to 988.

80.    Declare Defendants' enforcement of Student Code Section

II.4(e) against Plaintiff violated her First and Fourteenth Amendment rights.

81.    Award Plaintiff compensatory, nominal, and punitive damages, with compensatory damages in an amount in excess of $75,000 to be determined by the Court for the Defendants' unconstitutional interference with her rights under the First and Fourteenth Amendments causing pain, suffering, severe emotional distress, and financial loss including but not limited to lost wages (front pay), interest on loan payments, and loan reimbursement.

82.    Award Plaintiff her attorneys' fees and costs, including any expert fees, under 42 U.S.C. § 1988 and 42 U.S.C. § 1988, *29 U.S. Code § 794 a* and other applicable law.

83.    Award Plaintiff any other relief the court deems appropriate.

Respectfully submitted,

s/ Rand C. Eddy
OBA# 11822
Rand C. Eddy
Eddy Law Firm, P.C.
3644 Rolling Lane Circle
Midwest City, Oklahoma 73110
Tel: (405)203-6675
rand@eddylawok.com
*Attorney for Plaintiff and*
*Participating Attorney for*
*The Rutherford Institute*

s/ Sawmon Y. Davani
OBA# 34515
Davani Law, PLLC
2405 White Oaks Drive
Norman, OK 73071
Tel: (405) 414-5913
Facsimile (972) 584-1599
sawmon@davanilawpllc.com
*Attorney for Plaintiff and*
*Participating Attorney for*
*The Rutherford Institute*