IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MEGAN HSIEH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 5:25-cv-01160-J |
| | ) |
| STATE OF OKLAHOMA, ex rel., | ) RULING REQUESTED BY |
| THE BOARD OF REGENTS FOR THE | ) MARCH 16, 2026 |
| UNIVERSITY OF OKLAHOMA, et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Dated: March 9, 2026

Rand C. Eddy, OBA# 11822
Eddy Law Firm, P.C.
Attorney for Plaintiff
Participating Attorney for
  The Rutherford Institute
3644 Rolling Lane Circle
Midwest City, Oklahoma 73110
Tel: (405) 203-6675
rand@eddylawok.com

AND

Sawmon Y. Davani, OBA# 34515
Davani Law, PLLC
Attorney for Plaintiff
Participating Attorney for
  The Rutherford Institute
2405 White Oaks Drive
Norman, OK 73071
Tel: (405) 414-5913
Facsimile (972) 584-1599
sawmon@davanilawpllc.com

Plaintiff seeks a preliminary injunction to prohibit the University from providing inaccurate or untrue records indicating Plaintiff engaged in threatening behavior [Doc. 43] and submits this Reply to Defendants' Response [Doc. 45]. Bold numerals preceding certain paragraphs correspond with sections in Defendants' Response, but Plaintiff does not waive any issues unaddressed herein.

Defendants initially note Plaintiff's TRO was denied. [Doc. 45 at 1]. This Court reasoned that "Plaintiff cannot yet cite any 'actual lost opportunities.'" [Doc. 16 at 2]. But Plaintiff has now shown "actual lost opportunities" from her offers to volunteer being rejected because of her disciplinary record. [Doc. 44-1 ¶ 15; Doc. 44-7].

**Legal Standard:** Plaintiff does not need to show all four factors weigh in her favor—it is a balancing test, and the first factor weighs more than the others. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("in First Amendment cases, the likelihood of success on the merits will often be the determinative factor"); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) ("these are factors to be balanced, not prerequisites to be met").

Defendants mischaracterize this as a "disfavored injunction." [Doc. 45 at 2]. First, Plaintiff seeks to *prohibit* the University from acting to report the wrongful disciplinary record. While that would require a one-time minimal act to restore Plaintiff's original record to the status quo, it would not require continual action by the University or this Court, and thus does not mandate action sufficient to constitute a disfavored injunction. *See Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1261 (10th Cir. 2005) ("an injunction [is] mandatory if the requested relief affirmatively requires the nonmovant to act in a particular way *and*, as a result, places the issuing court in a position where it may have to provide *ongoing supervision* to assure the nonmovant is abiding by the injunction" (cleaned up) (emphasis added)). Second, the "status quo" is the Plaintiff's record *before* Defendants unconstitutionally

1

imposed a disciplinary violation on May 1, 2024; so, the Plaintiff seeks to *maintain* the status quo. *See id.* at 1260 ("the status quo is `the last uncontested status between the parties which preceded the controversy'"). Third, Plaintiff also seeks monetary damages in her lawsuit [Doc. 35 ¶¶ 81-83] which would not be awarded through this preliminary injunction [Doc. 43], and she thus would not obtain all relief sought. *See J.C. v. Laverne Pub. Sch. Dist.*, No. CIV-18-197-M, 2018 U.S. Dist. LEXIS 57904, at *3-5, *7, *12 (W.D. Okla. Apr. 5, 2018) (granting a preliminary injunction to reinstate a student after being suspended, and finding it was not disfavored in part because it did not grant monetary relief which the student also sought).

Even if the Court considers this to be a "disfavored injunction," the "heavier burden" applies only to the first and third factors "on the likelihood-of-success-on-the-merits and the balance-of-harms." *Free the Nipple-Ft. Collins v. City of Fort Collins*, 916 F.3d 792, 797-98, 800, 806 (10th Cir. 2019) (rejecting any higher standard that a plaintiff must show all or any factors "weigh heavily and compellingly" in her favor). And Plaintiff satisfies that strong showing and heavier burden.

**I.A:** Defendant's claim that "courts 'should refrain from second-guessing the disciplinary decisions made by school administrators.' *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*" [Doc. 45 at 4]. But that was said in rejecting an argument catastrophizing that schools would have to overly discipline students to avoid Title IX liability, and *Davis* held that courts could even identify whether a school's response was unreasonable "as a matter of law," as school disciplinary decisions are obviously not immune from judicial review. 526 U.S. 629, 646-48 (1999).

**I.B.1:** Defendants claim that *Counterman* is limited to criminal prosecutions, but the Supreme Court has consistently applied the same First Amendment protections on speech in both the criminal and civil context. *Counterman*, 600 U.S. 66, 76 (2023) (for incitement, "the First Amendment

2

precludes punishment, whether civil or criminal, unless" there is intent); *id.* at 80 (for defamation, the "recklessness rule" is "applicable in both civil and criminal contexts"). And multiple Supreme Court Justices have stated that *Counterman*'s ruling applies to civil cases. Defendants incorrectly claim that Justice Barrett's dissent in *Counterman* "speculated that the majority's holding 'may' extend to school administrators. *Id.* at 120 (Barrett, J., dissenting)." [Doc. 45 at 5]. But there was no speculation—rather, she definitively stated that "the Court's new rule applies to all of these situations" where "employers and school administrators…discipline individuals who make true threats," and that "can make all the difference in some cases." *Counterman*, 600 U.S. at 120 (Barrett, J., dissenting). The only "may"s were in the context that "[a] delusional speaker *may* lack awareness of the threatening nature of her speech." *Id.* (Barrett, J., dissenting) (emphasis added). She recognized that "this case [*Counterman*] is about the scope of the First Amendment…. Accordingly, the Court's holding affects the *civil* consequences for true threats just as much as it restricts criminal liability." *Id.* at 118-19 (Barrett, J., dissenting) (emphasis in original).

Additionally, Justice Sotomayor stated that *Counterman*'s holding applied to a negligence claim for personal injury caused by a third party in a civil case brought by a police officer against a protest leader. *Mckesson v. Doe*, 144 S.Ct. 913 (2024) (statement of Sotomayor, J., respecting the denial of certiorari). Justice Sotomayor explained that in *Counterman* the Court "*made clear that the First Amendment bars the use of 'an objective standard' like negligence for punishing speech.*" *Id.* at 914 (citing *Counterman*, 600 U.S. at 78, 79, n.5) (emphasis added).

Many other courts have also applied *Counterman*'s holding to civil cases. *See*, *e.g.*, *Czajkowski v. Richardson*, No. 24-1064, 2024 WL 4579388 (10th Cir. Oct 25, 2024) (per curiam) (unpublished) (slip op., at 6) (dismissing civil case as a sanction for threats, and noting plaintiff made

3

no claim that he lacked subjective awareness as required under *Counterman*); *de Laire v. Voris*, No. 21-CV-131-JL, 2023 WL 5096150, at *1, *6 (D.N.H. Aug. 9, 2023) (applying *Counterman* to civil defamation); *Cider Riot, LLC v. Patriot Prayer USA, LLC*, 544 P.3d 363, 370 (Or. Ct. App. 2024) (holding in a civil case that *Counterman* "unequivocally rejected a negligence standard for the imposition of liability arising out of speech"); *Kindschy v. Aish*, 8 N.W.3d 1, 8 (Wis. 2024) (holding that "*Counterman* applies to civil harassment injunctions premised on true threats").

Defendants cite to the Second Circuit's decision in *Leroy v. Livingston Manor Central School District* to claim that "*Counterman* only applies to criminal matters." [Doc. 45 at 5]. But in *Leroy*, the court held that the student's speech was protected and considered the student's subjective intent and understanding, quoting *Counterman* to explain that courts are "to avoid…a chilling effect, even when doing so 'shield[s] some otherwise proscribable' speech." 158 F.4th 414, 427-28 (2d Cir. 2025). The concurrence further explained that "to avoid overstepping the limits on their power…, [schools] may only regulate speech made with some degree of…'culpable mental state,'" *Id.* at 431 (Pérez, J., concurring) (quoting *Counterman*, 600 U.S. at 75).

**I.B.2:** Defendants, assuming *Counterman* applies, absurdly speculate that despite Plaintiff's mental health crisis, she still would have been thinking clearly about mandatory reporting and intended for 988 to relay her confidential statements to the University because of Okla. Stat. tit. 59, § 1376. [Doc. 45 at 6-7]. But that statute protects information from disclosure, unless:

> b. the patient has communicated to the psychologist an *explicit* threat to kill or inflict serious bodily injury upon a reasonably identified person *and the patient has the apparent intent and ability to carry out the threat*. …

59 O.S. § 1376(3)(b) (emphasis added). Defendants wrongly assume that standard was met. Rather, 988 violated the statute because the standards were not met (as Jim Black from 988 indicated [Doc.

4

35 ¶ 8]) because Plaintiff never made any "explicit threat to kill or inflict serious bodily injury" [*Id.* ¶¶ 8, 27-28] nor an implicit threat (as acknowledged by the University Hearing Panel [*Id.* ¶ 35]), and Plaintiff made clear, as stated both times by 988 to Defendants, that she had no "intent [or] ability" to cause any harm [*Id.* ¶¶ 27-28 (e.g., "no plan" and "she said she has nothing to do it with")]. And Joy from 988 only reported back under direction of Schofield. [*Id.* ¶ 13]. Thus, Plaintiff had no awareness, especially during a mental health crisis (as acknowledged by the Hearing Panel [*Id.* ¶ 35]), that her statements might be viewed or reported as threats.

Defendants are wrong to catastrophize and claim that "any speaker experiencing emotional distress could make detailed threatening statements…and then claim immunity." [Doc. 45 at 7]. First, Plaintiff did not make any "detailed threatening statements." Second, officials might prove that a speaker consciously disregarded the threatening nature of his speech, depending on the situation. But either way, this is what the First Amendment requires even if it "can make all the difference in some cases," such as where "[a] delusional speaker may lack awareness of the threatening nature of her speech." *Counterman*, 600 U.S. at 120 (Barrett, J., dissenting).

**I.C:** Defendants incorrectly state that "If *Counterman* does not apply to university disciplinary proceedings, then Plaintiff's First Amendment claim lacks a viable legal framework." [Doc. 45 at 12]. Rather, even if *Counterman* does not apply, Plaintiff's statements still were not true threats. Defendants thus try to distinguish *Watts*, but they mischaracterize and ignore details which were explained in Plaintiff's Brief [Doc. 44 at 7-11]. Despite what Defendants claim, Plaintiff was criticizing government actors as the cause of her mental health crisis, 988's Jim Black did not think she was expressing a plan or that there was any concern [Doc. 35 ¶ 8], and Schofield said it was not a threat [*Id.* ¶ 10]. Plaintiff's statements are less concerning and culpable than Watts's.

Defendants cite to two criminal cases from the Fourth Circuit. [Doc. 45 at 10]. First, in *United States v. Bly*, the defendant sent a letter directly to the subjects of his threats, describing his access and abilities with a rifle, enclosing practice targets with bullet holes, and stating, "I assure you tragic consequences" if recipients did not accede to his demands. 510 F.3d 453, 456 (4th Cir. 2007). The court found that Bly "explicitly promised violent retribution if he did not receive the result he sought." *Id.* at 459. Unlike *Bly*, Plaintiff did not communicate to nor extort the subjects of her frustration, and she expressly stated she was not going to harm anyone and had no means to do so. Next, in *United States v. Lockhart*, the defendant handed a letter to a store manager stating, "if [President] Bush refuses to…uphold the Constitution I *will* personally put a bullet in his head." 382 F.3d 447, 449 (4th Cir. 2004) (emphasis added). The defendant stated a specific plan of harm she was *going to do*, which is nothing like what Plaintiff expressed she *felt* to 988 when seeking help.

**II.A:** Defendants' argument that Plaintiff caused her own harm by pursuing this lawsuit to prevent that same harm which would be done to her by Defendants defies common sense. Plaintiff filed under a pseudonym. [Doc. 1; Doc. 30]. Although Defendants failed to identify any prejudice that caused them, Defendants demanded that Plaintiff proceed under her actual name [Doc. 27; Doc. 33], which was pure gamesmanship meant solely to further intimidate, harass, and harm Plaintiff to discourage her from continuing with this lawsuit. Defendants now blame Plaintiff for doing exactly what they forced her to do. Sealing the exhibits would have had no purpose and made no difference—all details from the exhibits were already revealed or would have to be revealed for Plaintiff to establish her case in the Complaint [Doc. 1; Doc. 35] and briefs [Doc. 14; Doc. 44]. The only point of initially sealing the exhibits was to hide Plaintiff's name so that those details, which are protected under HIPAA and FERPA, would not be associated with her. And before Plaintiff filed under

her name (11/14/25), Defendants published her name and lawsuit online: https://www.ou.edu/content/dam/regents/docs/2025/NovemberFinalAgenda.pdf. Ex. 1.

Regardless, disclosure in a lawsuit or to volunteer organizations does not equate to disclosing those details to residency programs (like Defendants disclosed to Dr. Lees [Doc. 45-3]). It is unlikely and there is no evidence that residency programs have PACER accounts and search for lawsuits involving each applicant, nor would the volunteer organizations to which Plaintiff applied contact the residency programs. And "[i]nformation is not 'generally known' simply because it has been discussed in open court, or is available in court records, in libraries, or in other public repositories of information." ABA Comm. on Ethics & Pro. Resp., Formal Op. 479 (Dec. 15, 2017).

Defendants claim that they merely mention a suspension "for one year" on the MSPE [Doc. 45 at 12] and that it is up to Plaintiff to "successfully contextualize" (i.e., lie, deceive, mislead) [Doc. 45 at 14, 16] her response on the ERAS application to "explain the reason" for any sanctions [Doc. 44-2 at 3]. Defendants claim that Plaintiff's brief description to the volunteer organizations "far exceed[s]" the University's mention of a mere suspension [Doc. 45 at 13-14, 18], but Plaintiff only gave basic facts, not full details, and far less than what Plaintiff would have to disclose to residency programs in her ERAS application and interviews to avoid sanctions. Ex. 2.

**II.B:** Defendants claim that "[Plaintiff] cannot articulate, with any specificity, what irreparable harm she will suffer." [Doc. 45 at 16]. But Plaintiff has clearly stated the harm: Plaintiff will not be accepted by a favorable residency, if any, with this disciplinary record. [Doc. 44 at 4-5, 15-22]. This is widely recognized as an obvious harm by the Supreme Court and many other courts. [*Id.* at 15-22]. Defendants provide no authority to dispute that this constitutes an actual and concrete harm. Requiring Plaintiff to first be rejected from residency and irreparably damage her reputation and

career would defeat the entire purpose of a preliminary injunction and is *not* required. That was the error the Fourth Circuit was overturned for in *Mahmoud*. Plaintiff's likely rejection and reputational damage is no more speculative than the risk in *Mahmoud* that teachers might expose the children to content conflicting with parents' religious practice, which was theoretically uncertain (ex., maybe a teacher would disobey and not use the material, or maybe the child would be out sick that day).

Defendants concede this harm in stating: "Defendants do not dispute that a notation of a suspension may affect Plaintiff's residency prospects to some degree." [Doc. 45 at 16]. That by itself should settle the issue in Plaintiff's favor. Defendants then go on to claim that the "nature and magnitude of any effect of disclosure is entirely unknown" [*Id.* at 16], but later completely contradict themselves by claiming that Plaintiff being accepted to a residency program "endangers public safety" and that "[r]esidency programs and medical licensing authorities have…an obligation to consider [her disciplinary record]" [Doc. 45 at 23-24], just as the volunteer programs considered it and rejected Plaintiff as a liability. And Dr. Lees's declaration noticeably fails to affirm that he would ever even consider offering a residency position to an applicant who has been suspended for a full year for a violation of threatening to harm or kill medical school administrators. [Doc. 45-3].

**II.C:** Defendants state that "[t]he difference between volunteer, non-medical positions involving vulnerable children and a competitive medical residency program is obvious." [Doc. 45 at 17]. Indeed, it is. The fact that Plaintiff is not even accepted to merely volunteer because of her disciplinary record is clear proof that there is no chance of her being accepted to a paid and highly competitive medical residency program. The National Resident Matching Program statistics have no bearing on the harm caused by Plaintiff applying with a disciplinary record, but indicate potential risk of additional harm by further delaying Plaintiff's application for residency until after her graduation

8

this Spring [Doc. 44-8] in addition to the irreparable harm of further delaying her career [Doc. 44 at 18-22].

**II.D:** Defendants cite no authority to support any argument that the timing of Plaintiff's Motion somehow lessens or negates the harm she faces. There was never any period of "inaction" or "delay" by Plaintiff. [Doc. 44-1 ¶¶ 21-28]; Ex. 3. Defendants note that Plaintiff had assistance from other attorneys for previous matters, but those attorneys are not undersigned counsel, Plaintiff already explained that her attorney for the panel hearing declined to take on this lawsuit [Doc. 44-1 ¶ 23], and The Rutherford Institute is in Virginia, its August 2024 letter explained, "We are not representing [Plaintiff] as her attorneys at this time" [Doc. 45-4 at 1], and, again, local undersigned counsel was not able to be found and retained by Plaintiff until June 2025. [Doc. 44-1 ¶ 24].

**III.A:** Defendants argue that Plaintiff's reputational harm is theoretical and speculative, yet then argue based on conjecture that the University would suffer "severe" "reputational damage." [Doc. 45 at 22]. The Defendants have caused themselves any risk of that potential harm by violating Plaintiff's constitutional rights. Defendants claim they would have to make an "affirmative misrepresentation" by not reporting Plaintiff's suspension [Doc. 45 at 22], but it would be an affirmative misrepresentation to report that Plaintiff engaged in threatening behavior.

Also, Defendants' alleged harm is conditional—it only potentially results if the preliminary injunction is reversed, as Dr. Lees's declaration explains:

> It is my opinion that if a medical school omitted a suspension from a student's records, *and that omission was later discovered*, the consequences for the school's credibility *could* negatively impact the candidacy and competitiveness of future students from that institution. …. It is my opinion that if the University was ordered to remove the notation from [Plaintiff]'s record…*and if [Plaintiff] ultimately did not prevail in this lawsuit*, the University would need to contact every program that received the incomplete record and correct it.

9

[Doc. 45-3 ¶¶ 9-10 (emphasis added)]. But that condition is unlikely to happen since Plaintiff is likely to succeed on the merits and there are little to no facts in dispute which would likely change that finding. Even if it does happen, any reputational damage to the University is unlikely since the University did not choose to hide or willfully fail to disclose a violation (such as the example Dr. Lees gave [Doc. 45-3 ¶ 12]), but rather withheld reporting a disputed violation as required by court Order and then dutifully disclosed it—that would not harm the University's reputation or credibility.

**III.B:** No public safety is endangered by the University not reporting a wrongful disciplinary finding, because Plaintiff never made any threats. Plaintiff has been a full-time student at OUHSC this entire school-year and Defendants concede that she "has performed well since her return to the program." [Doc. 45-2 ¶ 5].

**III.C:** Ruling in Plaintiff's favor would not chill any school threat response protocols. This matter deals completely with school disciplinary proceedings which punish students. Nothing would inhibit the University from taking steps to investigate and clarify if a threat was actually made or from imposing necessary safety measures while any concern is investigated or stabilized, which is also why imposing disciplinary punishments like this is not the least-restrictive means of dealing with potential threats. However, it would hopefully cause the University to actually respect its students' constitutional rights and get the facts straight before recklessly rushing to impose unjustified, career-destroying punishments on its students.

**Conclusion:** Plaintiff's Motion for Preliminary Injunction should be granted.

        <u>s/ Rand C. Eddy</u>
Rand C. Eddy, OBA# 11822
Eddy Law Firm, P.C.
Attorney for Plaintiff
Participating Attorney for
  The Rutherford Institute
3644 Rolling Lane Circle
Midwest City, Oklahoma 73110
Tel: (405) 203-6675
rand@eddylawok.com

AND

<u>s/ Sawmon Y. Davani</u>
Sawmon Y. Davani, OBA# 34515
Davani Law, PLLC
Attorney for Plaintiff
Participating Attorney for
  The Rutherford Institute
2405 White Oaks Drive
Norman, OK 73071
Tel: (405) 414-5913
Facsimile (972) 584-1599
sawmon@davanilawpllc.com

## **<u>CERTIFICATE OF MAILING</u>**

I hereby certify that, on the 9th day of March 2026, a copy of the foregoing was filed with the Court using the ECF system, which sent electronic notification to all counsel of record.

        <u>s/ Rand C. Eddy</u>
        Rand C. Eddy