## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

MEGAN HSIEH,                          )
                                      )
                    Plaintiff,        )
                                      )
v.                                    )        Case No. CIV-25-1160-J
                                      )
STATE OF OKLAHOMA ex rel.,            )
THE BOARD OF REGENTS for the          )
UNIVERSITY OF OKLAHOMA, et al.,       )
                                      )
                    Defendants.       )

## ORDER

Plaintiff brings suit against the State of Oklahoma, ex rel. The Board of Regents for the University of Oklahoma (the University); David A. Surratt and Kalyn Cavazos in their official capacities (the University Defendants); and David A. Surratt, Kalyn Cavazos, and Terry Schofield in their individual capacities (the Individual Defendants) (collectively, the Defendants). Before the Court is the Defendants' Motion to Dismiss, which seeks dismissal of Plaintiff's Amended Complaint (Amend. Compl.) for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) [Doc. No. 36] (Mot. to Dismiss). Plaintiff filed a response [Doc. No. 41] (Resp.), and Defendants replied [Doc. No. 42] (Reply) For the reasons set forth below, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

### I.    Background

Plaintiff was enrolled as a medical student at the University of Oklahoma Health Science Center and was registered with the University's disability accommodations office due to diagnoses of generalized anxiety disorder, major depressive disorder, and Attention Deficit Hyperactivity Disorder (ADHD). Amend. Compl. ¶ 1. In 2024, Plaintiff experienced a mental health crisis,

prompting her to contact the 988 Suicide and Crisis Lifeline, which provides "free and confidential emotional support to people in suicidal crisis or emotional distress." *Id.* ¶¶ 1, 5–6. In her phone calls with the 988 operators on April 27 and May 1, Plaintiff made numerous statements that are the central focus of this litigation.[1] For example, she stated: (a) she "wished that [Kate Stanton, an administrator at the University] would die" and that she wanted other administrative staff at the medical school to die; (b) "I am so tired and done; I want to rip my head off" and "leave a note to the news at the school and let them know that it's this place's fault and destroy the school in the process;" (c) "I want to end it all at the school, five minutes before post it to the news, tell other med schools, and take the administration with me;" (d) "[I want to] yeet off the planet and yeet them [the administrators] too;" and (e) "I want her to pay in one way or another, and I want the school to pay in one way or another." *Id.* ¶¶ 8, 32, 33; Ex. 9.

During the April 27 phone call, the 988 operator was "able to stabilize" Plaintiff and create a "safety plan for her," so that by the end of the call she was "not making any more threatening statements or wanting to hurt herself." Ex. 5 at 3:8–4:12; Ex. 6 at 5:16–6:3. Although the 988 operator thought it was "kind of a 51/50," meaning it was a close call, he elected to warn the University about Plaintiff's statements. Amend. Compl. ¶ 8. For example, the 988 operator explained "she's not an immediate threat to herself or anybody else" and "even though we don't think that she was serious about the threats, we just don't want to leave any stone unturned. We dot the I's and cross the T's." *Id.*; Ex. 6 at 4–5. He also noted Plaintiff lacked the means to carry

---

[1] 988 phone calls are generally recorded. Plaintiff attached numerous transcripts to the Amended Complaint, but neither party has presented the Court with a transcript of Plaintiff's original phone call with 988 on April 27. *See* Amend. Compl. ¶¶ 8–9. The parties dispute Plaintiff's precise words in her April 27 phone call and the context surrounding her statements in the May 1 phone call. *Id.* Nonetheless, the Court takes the allegations in the Amended Complaint as true at this stage.

out any harm and that her statements were "just more of her expression of . . . the episode that she was having." Ex. 6 at 11:18–12:4 ("She did report she had no means . . . . [S]he hadn't really formed a plan."); Amend. Compl. ¶¶ 7–11, 14; Ex. 9 at 2:6–19; 5:2–17; 12:10–22.

Upon learning of her statements, Terry Schofield, the deputy chief of police with the University, began discussing with a 988 operator whether they should place Plaintiff in protective custody because "she's definitely displaying homicidal and suicidal ideations" and Mr. Schofield knew "what she's getting at, yeet out, yeet them out, whatever . . . . it only leads to believe one thing of what she's talking about." *See* Ex. 10 at 4:15–7:17; 12:22–13:2.[2] During his discussion, Plaintiff alleges Mr. Schofield "disclosed Plaintiff's mental health diagnoses, including general anxiety, PTSD, ADHD, and major depressive disorder" to the 988 operator. Amend. Compl. ¶ 12.[3]

On May 7, 2024, Kalyn Cavazos, the Assistant Dean of Students & Director of Student Conduct, sent Plaintiff a letter explaining that she was expelled from the University because her statements to the 988 operator violated the University's Student Rights and Responsibilities Code (Code). Ex. 3. Specifically, Plaintiff violated § II.4.e, which prohibits:

> Threatening Behavior: A serious expression of intent to commit an act of unlawful violence against a particular individual, identifiable group, or damage to property. The threatening violence, including intimidation, causes reasonable fear of injury to the health or safety of any person, group, or property.

Ex. 1; Ex. 3; Amend. Compl. ¶ 57. Plaintiff appealed the decision and was granted a formal hearing before a three-person panel that lasted approximately three and a half hours. Amend. Compl.

---

[2] Ultimately, Plaintiff was not taken into protective custody because by the time the Oklahoma City Police Department arrived at Plaintiff's apartment on May 1st, she "said she has no intentions of actually hurting anybody . . . she's just extremely frustrated." Ex. 11 at 2:23–6:19. Thus, "the exigent circumstances . . . had gone beyond a reasonable time." Ex. 13 at 5:10–13.

[3] To the extent these statements implicate Mr. Schofield, the Court also notes Exhibit 5 to the Amended Complaint indicates 988 was already aware of her diagnoses and additionally knew that "[s]he is receiving treatment, and medication is compliant." Ex. 5 at 4:14–20.

¶¶ 25, 35, 37; Ex. 2.[4]  At the start of the hearing, the chair of the panel informed the participants of various "ground rules of the hearing."  *See* Ex. 14 at 4.  For example, the chair's stated role was "to ensure that due process and basic fairness are being served for both parties involved."  *Id.*  The hearing was recorded but closed to the public.  *Id.*  And, although the chair admonished the participants that "this is not a court of law but an internal university hearing," the procedures included: opening and closing statements; honoring the rule of sequestration; requiring witnesses to affirm their testimony is truthful; enforcing a preponderance of the evidence standard of proof; giving probative value to evidence; excluding incompetent, irrelevant, immaterial, and unduly repetitious evidence; entertaining objections to the evidence; examining witnesses; deliberating in private; and considering aggravating and mitigating circumstances in assigning a penalty.  *Id.* at 8–13.[5]  Moreover, both parties were represented by counsel, and both parties retained the right to appeal the panel's decision.  *Id.*

At the hearing, Plaintiff testified on her own behalf, and she was questioned regarding her statements to the 988 operators.  Plaintiff testified that she never told 988 that she wanted to kill or harm Ms. Stanton, that she had no plan and no access to any means of harm (e.g., a gun), and that she was incapable of getting up from the floor.  Amend. Compl. ¶¶ 28, 31.  She also explained that by "destroy" she meant "I really wanted them to know that . . . if I were to hurt myself . . . it was because of all these pressures from school;" that when she used the phrase "yeet off the planet and yeet them all too" she meant she wanted "to let the news and medical schools know that it's

---

[4]  The three-person panel consisted of various constituencies on campus, including one faculty member who served as the chair of the panel, one staff member, and one student representative.  Ex. 14 at 2:3–12.

[5]  However, Plaintiff alleges multi-layer hearsay evidence was introduced.  Amend. Compl. ¶¶ 26–27.

because of this place;" and when she said she wanted Stanton "to pay in one way or another" she really meant that she wanted Stanton "to lose her career, lose her reputation, like I want to expose her." *Id.* ¶ 28, 32–33.

Both parties appealed the panel's one-year suspension to the University Vice President for Student Affairs and Dean of Students, David Surratt. *Id.* ¶¶ 36–37.  On appeal, Mr. Surratt stated he reviewed the record—including a video recording of the hearing, the exhibits, and the hearing panel decision—but nevertheless affirmed the suspension.  *Id.*; Mot. to Dismiss at 11.

Plaintiff has already completed her one-year suspension, but is currently proceeding through a residency application and has expressed concern regarding the possible stigma she will face if the suspension remains on her record.  Amend. Compl. ¶ 38–39; Resp. at 4.  Thus, Plaintiff asserts claims under 42 U.S.C. § 1983 for First and Fourteenth Amendment violations and under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging she was improperly disciplined due to her statements to the confidential 988 Suicide Crisis Lifeline.  Defendants move to dismiss asserting, in part, lack of standing and entitlement to both absolute and qualified immunity.

## II.  <u>Standard of Review</u>

### A.  Subject-Matter Jurisdiction

Defendants argue that "any threat of future discipline is too speculative to confer standing."  Mot. to Dismiss at 9.  This assertion challenges the Court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See Murray v. Colorado*, 149 F. App'x 772, 774 (10th Cir. 2005).  A Rule 12(b)(1) motion seeking dismissal for lack of subject-matter jurisdiction takes the form of a facial attack or a factual attack.  *See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).  With a facial attack, such as the one made by the Defendants, the movant challenges

the sufficiency of the complaint, and the district court must accept all well-pleaded allegations in the complaint as true. *See id.*; *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009).

### B. Failure to State a Claim

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts all well-pled factual allegations as true and views them in the light most favorable to the non-moving party. *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014). That the Court accepts them as true, however, does not mean the allegations in a complaint are in fact true; a plaintiff is not required to prove his or her case at the pleading stage. *See Glover v. Mabrey*, 384 F. App'x 763, 772 (10th Cir. 2010). Rather, the complaint "must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1287 (10th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

While the court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted," there are exceptions to the rule that a court may only consider facts alleged within the complaint when deciding a Rule 12(b)(6) motion. *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 941 (10th Cir. 2002) (internal quotation marks omitted). Relevant here, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.*; *accord Smallen v. The W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020).

### III.  <u>Analysis: Plaintiff's § 1983 Claims</u>

Plaintiff brings Counts I, II, and III under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments of the Constitution of the United States. To state a claim under § 1983 that will withstand a Rule 12(b)(6) motion to dismiss, plaintiff must allege "(1) a violation

of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom, or usage, of any State." *Beedle v. Wilson*, 422 F.3d 1059, 1064 (10th Cir. 2005) (citation modified).   Plaintiff brings these claims against the University, the University Defendants in their official capacities, and the Individual Defendants in their individual capacities, seeking actual and punitive damages, injunctive relief, and attorney fees and costs. Amend. Compl. ¶¶ 79–83.

### A.  Claims brought against the University

As set forth above, a cause of action under § 1983 requires the deprivation of a civil right by a "person" acting under color of law.   42 U.S.C. § 1983; *McLaughlin v. Bd. of Trs. of State Colls. of Col.*, 215 F.3d 1168, 1172 (10th Cir. 2000).   The University, as an arm of the State, is not a person under § 1983.  *See McLaughlin*, 215 F.3d at 1172; *Harris v. Champion*, 51 F.3d 901, 905–906 (10th Cir. 1995).   As such, Plaintiff's claims arising under § 1983 against the University fail and are dismissed with prejudice.   *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 107 F.4th 1121, 1135 (10th Cir. 2024); *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190–91 (10th Cir. 2014).

### B.  Claims brought against the University Defendants

Plaintiff seeks injunctive relief requiring the University to: (1) expunge and permanently remove all documented notations, records, and any other materials related to her disciplinary incident and suspension from her educational and personal records; (2) refrain from reporting the suspension on Plaintiff's application materials for residency; (3) recharacterize Plaintiff's one-year suspension as an excused leave of absence; and (4) refrain from pursuing future disciplinary action against Plaintiff based on her statements to the 988 operator.   Amend. Compl. ¶ 79.   Defendants

argue the first three requests for relief are barred because they impermissibly seek retroactive relief. Mot. to Dismiss at 8. With respect to the fourth request for relief, Defendants instead argue Plaintiff lacks standing because the threatened injury is not "certainly impending." *Id.* at 9 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

### 1. Prospective Injunctive Relief

In suits for damages or retroactive injunctive relief, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 61, 71 (1989); *see also Amaro v. New Mexico*, 737 F. App'x 882, 888-89 (10th Cir. 2018); *McLaughlin*, 215 F.3d at 1172. As such, Plaintiff's claims for damages and retroactive injunctive relief brought against the University Defendants in their official capacities fail to state a claim upon which relief can be granted under § 1983 and are dismissed with prejudice. *Tufaro*, 107 F.4th at 1135; *Knight*, 749 F.3d at 1190–91.

To the extent, however, Plaintiff brings claims for prospective injunctive relief against the University Defendants in their official capacities for an ongoing violation of federal law, those claims are not barred. *See Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal quotation marks omitted); *Ex parte Young*, 209 U.S. 123 (1908) (setting forth the doctrine that the Eleventh Amendment generally does not bar a suit against a state official in federal court that seeks only prospective equitable relief for violations of federal law, even if the state is immune).

Defendants argue the first three requests for relief are impermissibly retrospective because they address past violations rather than ongoing or future harms, citing *Buchwald v. Univ. of New Mexico Sch. of Med.*, 159 F.3d 487, 494 (10th Cir. 1998), for the proposition that modifying

academic records is barred retrospective relief. Mot. to Dismiss at 8. The Court disagrees. First, Defendants' reliance on *Buchwald* is misplaced. In *Buchwald*, a student sought an injunction ordering her immediate placement into the University of New Mexico School of Medicine after she was repeatedly denied admission in violation of the Constitution. *Buchwald*, 159 F.3d at 495. The Court noted the *Ex parte Young* exception is "a narrow one," but nonetheless concluded an order requiring her immediate placement into the School of Medicine was prospective even though it was based on the University's past violation of the Constitution. *Id.* As the Tenth Circuit explained in a footnote, "the existence of a past harm does not convert a prospective injunction into retrospective relief." *Id.* at 495 n.5. Second, the weight of authority cited by Plaintiff suggests the relief she seeks is prospective. *Doe Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) (collecting cases and explaining that a "marred record is a continuing harm"); *see also Goss v. Lopez*, 419 U.S. 565, 567–71, 584 (affirming injunction requiring administrators to remove a suspension that could "seriously damage" the students' reputations and "interfere with later opportunities for higher education and employment"). Accordingly, the Court declines to dismiss Plaintiff's claims against the University Defendants to the extent she seeks prospective injunctive relief.

### 2. Standing

Turning to the fourth request for relief—prohibiting the University from pursuing future disciplinary action based on Plaintiff's prior statements to the 988 operator—Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1), asserting Plaintiff lacks standing because the threatened injury is not "certainly impending." Mot. to Dismiss at 9. To establish Article III standing, the injury must be "[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

Here, the Amended Complaint lacks any facts to suggest the injury is concrete, particularized, and actual or imminent.  Indeed, there are no facts suggesting the University will revisit Plaintiff's suspension or otherwise pursue any other alternative grounds of discipline against Plaintiff based on her prior statements to the 988 operators.  *Buchwald*, 1599 F.3d at 494 n.2. [6]  Without more, and taking the facts alleged in the Amended Complaint as true, the Court finds Plaintiff lacks standing to seek relief restraining the University from pursuing future disciplinary action against Plaintiff based on her prior statements to the 988 operators.

### C. Claims brought against the Individual Defendants

The Individual Defendants present two defenses to the claims brought against them in their individual capacities: (1) they are protected by absolute immunity; and (2) they are protected by qualified immunity.  Mot. to Dismiss at 10–24.  The Court addresses each in turn.

### 1. Absolute, Quasi-Judicial Immunity

In essence, Defendants invite the Court to extend absolute, quasi-judicial immunity to Individual Defendants Kalyn Cavazos and David Surratt because their functions as "prosecutor" and "appellate reviewer" are sufficiently analogous to the functions normally performed by a judge.  *Id.* at 10–12.  Even assuming the University's disciplinary scheme included adequate procedural safeguards, *see* discussion *infra* Section III.C.3(c), the Court concludes their functions were not sufficiently analogous to those of a neutral and detached judge to justify the extraordinary protection of absolute immunity.

---

[6]  "Though seemingly paradoxical," the Tenth Circuit held the student lacked standing to seek an injunction "prohibiting *future* use of the disputed preference" for long-term New Mexico residents because Plaintiff failed to allege sufficient facts in her complaint that she intended to re-apply. *Buchwald*, 1599 F.3d at 493–94.  The Court left to the district court's discretion whether the student could amend her complaint.  *Id.* at 494 n.2.

Absolute immunity is a "strong medicine" that threatens to frustrate the remedial purposes of § 1983 litigation, which seeks to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Forrester v. White*, 484 U.S. 219, 230 (1988); *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Thus, absolute immunity is the exception, not the norm. *Robinson v. Volkswagenwerk AG,* 940 F.2d 1369, 1370 (10th Cir.1991) ("Given the sparing recognition of absolute immunity by both the Supreme Court and this court, one claiming such immunity must demonstrate clear entitlement."); *Butz v. Economou*, 438 U.S. 478, 506–507 (1978) (limiting absolute immunity to "those exceptional situations" where it is "essential for the conduct of the public business"). Indeed, absolute immunity is reserved for officials whose functions are comparable to those of judges or prosecutors acting within the judicial process. *E.g., Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (discussing the "functional approach" in connection with witness immunity).[7]

Applying this functional approach, the Court finds Cavazos and Surratt did not act in a role comparable to a judicial officer. When the University held its disciplinary hearing to determine whether to suspend or expel Plaintiff, Kalyn Cavazos was the University's Director of Student Conduct and Assistant Dean of Students. Amend. Compl. at 3. At the hearing, Cavazos argued on

---

[7] The Tenth Circuit has adopted two benchmarks for determining whether absolute immunity should be extended to non-judicial officials. Under either approach, however, the Court is required to consider the official's functions. *Horwitz v. State Bd. of Med. Exam'rs of Colo.*, 822 F.2d 1508, 1513 (10th Cir. 1987) (creating a three-part formula: (1) the officials' functions must be similar to those involved in the judicial process, (2) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (3) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct); *e.g., Moore v. Gunnison*, 310 F.3d 1315, 1317 (10th Cir. 2002) (adopting the Supreme Court's six-factor approach: (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (3) insulation from political influence; (4) the importance of precedent; (5) the adversary nature of the process; and (6) the correctability of error on appeal).

behalf of the University when she presented evidence, cross-examined witnesses, and gave opening and closing arguments.  *Id.* ¶¶ 24–30; *see* Mot. to Dismiss at 11–12.  Both Cavazos and Plaintiff appealed the panel's one-year suspension to the University Vice President for Student Affairs and Dean of Students, David Surratt, who stated he reviewed the record (a video recording, exhibits, and the panel's decision) but nevertheless affirmed the suspension.   Amend. Compl. ¶¶ 36–37; Mot. to Dismiss at 11.   Although the disciplinary hearing afforded ample procedural safeguards to satisfy the Due Process Clause, *see* discussion *infra* Section III.C.3(c), those safeguards do not justify the extraordinary extension of absolute, quasi-judicial immunity to University employees presiding over student disciplinary hearings.  Unlike formal adjudicators operating under the Administrative Procedure Act or state licensing statutes, the proceeding in this case was governed by University policy and decided by a panel consisting of two University employees and a current student.[8] As a result, Cavazos and Surratt were "under obvious pressure to resolve a disciplinary dispute in favor of the institution" and therefore lacked the independence to function as judicial decisionmakers.  *Cleavinger v. Saxner*, 474 U.S. 193, 204 (1985); *Moore,* 310 F.3d at 1318 (denying absolute immunity because review committee composed of institutional employees "lack[ed] the kind of independence typical of judicial bodies").  Because they were not neutral and detached adjudicators, but rather operated within the University's internal hierarchy, they are not entitled to absolute, quasi-judicial immunity.

---

[8]  This case is distinguishable from *Guttman v. Khalsa*, 446 F.3d 1027 (10th Cir. 2006) in which the Tenth Circuit granted absolute, quasi-judicial immunity to a hearing officer and administrative prosecutor for their conduct in a New Mexico Board of Medical Examiners administrative hearing. The officials in *Guttman* were guided by state licensing statutes rather than internal institutional policies and their decision was subject to the "substantial evidence" and "arbitrary, capricious, or fraudulent" standard of review.  *Guttman*, 446 F.3d at 1030.

### 2. Absolute Witness Immunity

Defendants assert Mr. Schofield is entitled to absolute immunity for his testimony at the disciplinary hearing because "[w]itnesses in judicial and quasi-judicial proceedings are entitled to absolute immunity from civil liability for their testimony." Mot. to Dismiss at 12 (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983)). However, the Court need not fully decide this difficult question in this case. First, although the Amended Complaint states Mr. Schofield "misrepresent[ed]" events at the disciplinary hearing, Amend. Compl. ¶¶ 19, 30, Plaintiff asserts his testimony at the disciplinary hearing is not the basis for her claims. Resp. at 10–11.

Second, the Court need not consider Defendants' argument because it was raised only in a perfunctory and undeveloped manner. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *Beckham Cnty. Rural Water Dist. No. 3 v. City of Elk City*, No. CIV-05-1485-F, 2014 WL 12818160, at *13 (W.D. Okla. Mar. 28, 2014) ("[T]he court declines to undertake the research, to say nothing of the advocacy, necessary to support" the undeveloped contentions"). Here, Defendants devote only a few sentences to the issue and rely solely on *Briscoe v. LaHue*, 460 U.S. 325 (1983) without meaningfully explaining why its rationale should extend to an internal disciplinary proceeding. Mot. to Dismiss at 12. In *Briscoe*, the Supreme Court granted absolute witness immunity to a police officer who offered allegedly perjured testimony in a criminal trial. 460 U.S. at 327, 342–44. Defendants offer no analysis bridging that context to the one presented here. Instead, the entirety of Defendants' argument is the conclusory assertion that absolute witness immunity "should logically extend to administrative disciplinary hearings that afford procedural safeguards," such as requiring witnesses to testify under oath subject to potential discipline. Mot. to Dismiss at 12 n.4. Defendants provide no

authority applying *Briscoe* to "quasi-judicial proceedings," let alone an internal disciplinary proceeding, and offer no developed explanation why the presence of an oath warrants extending absolute immunity beyond the judicial context in which it arose. Given this cursory treatment, the Court declines to develop Defendants' argument for them as to whether *Briscoe's* trial-witness immunity should be expanded to this materially different context.

### 3. Qualified Immunity

Qualified immunity protects government officials, in their individual capacities, from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a defendant asserts qualified immunity in a motion to dismiss, the Court considers "(1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether the right at issue was clearly established." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013). The Court may consider the two prongs of the qualified immunity test in either order. *See id*.

### (a) Count I: Free Speech

Plaintiff claims her confidential statements to the 988 operators constitute protected speech, while Defendants argue the statements fall within the "true threats" exception and therefore receive no constitutional protection. Although it is a close case, at this stage of the proceedings, the Court agrees with Plaintiff.

Under the first prong of the qualified immunity test, the Court considers whether the facts alleged make out a violation of a constitutional right. *Keith*, 707 F.3d at 1188 (10th Cir. 2013). There is no dispute true threats do not qualify as speech protected by the First Amendment. The Supreme Court defines true threats as "serious expression[s]" conveying that a speaker means to

"commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359 (2003). In 2023, the Supreme Court also added a subjective mens rea requirement to its true threats definition. *See Counterman v. Colorado*, 600 U.S. 66 (2023). Under *Counterman*, the University must show Plaintiff's subjective mental state was reckless—that is, that she "consciously disregarded a substantial risk that [her] communications would be viewed as threatening violence." *Id.* at 69, 77–79.

The Supreme Court's rationale for *Counterman* is critical in this case. *Counterman* sustained the necessity of an intent requirement, although recognizing that it "has a cost," because of "the likelihood that the absence of such a mens rea requirement will chill protected, nonthreatening speech." *Id.* at 72–73. In short, a speaker may "swallow words that are in fact not true threats" out of fear "of mistaking whether the statement is a threat." *Id.* at 78 (citation modified). In crafting the rule, the Supreme Court surveyed numerous other instances in which it added a subjective element in both civil and criminal cases involving speech. *Id.* at 75–78 ("The reasoning—and indeed some of the words—came straight from this Court's decisions insisting on a subjective element in other unprotected-speech cases, whether involving defamation, incitement, or obscenity.").

Here, there are ample factual allegations that, if true, speak to Plaintiff's subjective mental state. Most notably, Plaintiff testified on her own behalf at the disciplinary hearing and was questioned regarding her statements to the 988 operators. For example, Plaintiff testified that she never told 988 that she wanted to kill or harm Ms. Stanton, that she had no plan and no access to any means of harm (e.g., a gun), and that she was incapable of accomplishing any harm because she could not get up from the floor. Amend. Compl. ¶¶ 28, 31; Ex. 14. She also explained that by "destroy" she meant "I really wanted them to know that . . . if I were to hurt myself . . . it was

because of all these pressures from school," that when she used the phrase "yeet off the planet and yeet them all too" she meant she wanted "to let the news and medical schools know that it's because of this place," and when she said she wanted Stanton "to pay in one way or another" she really meant that she wanted Stanton "to lose her career, lose her reputation, like I want to expose her." Amend. Compl. ¶ 28, 32–33. Additionally, at the pleading stage, Plaintiff's allegation that she believed the conversation was confidential supports the inference that she lacked the constitutionally required mens rea. *Id.* ¶ 48. While experiencing a crisis, Plaintiff alleges she communicated her statements to what she understood to be a confidential crisis hotline—an outlet designed to invite individuals to express distressing thoughts so they may secure help. *Id.* ¶ 34 ("I called them to confidentially deescalate the intrusive thoughts, not to make threats . . . . I'm not a violent person. I feel like I've been misunderstood by everyone that I asked for help from.").

It is also worth noting that even the 988 operator concluded she was "not an immediate threat to herself or anybody else." *Id.* ¶ 8. And, although it was a close call, he elected to warn the University, in part, because "[w]e dot the I's and cross the T's." Ex. 6 at 4–5. Finally, Terry Schofield, the deputy chief of police with the University of Oklahoma, agreed that even though "saying I wish someone was dead . . . is ugly and not right to say," it is not a threat, "it's not hate speech, it's free speech." Ex. 8 at 10:21–11:7. Thus, taking the allegations in the Amended Complaint as true, the Court finds Plaintiff has alleged sufficient facts to establish a violation of a constitutional right so as to satisfy the first prong of the qualified immunity test.

The second prong of the qualified immunity test requires the Court to determine whether the right at issue was clearly established at the time of the alleged violation. *Keith*, 707 F.3d at 1188 (10th Cir. 2013). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what [they are] doing violates that right." *Mullinex*

*v. Luna*, 577 U.S. 7, 12 (2012).  The Supreme Court has repeatedly admonished lower courts to refrain from defining clearly established law at a high level of generality.  *Id.* at 12.[9]  Thus, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* (citation modified).  Plaintiff is not required to provide "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Here, the rule in *Counterman* was clearly established by the time Plaintiff was suspended.  Although *Counterman* arose in the criminal context, its holding applies with equal force in civil cases.  *Counterman*, 600 U.S. at 76 ("[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder."); *see Mckesson v. Doe*, 144 S. Ct. 913, 218 (2024) (denying writ of certiorari on April 15, 2024 in civil negligence case and instructing lower courts to "give full and fair consideration to arguments regarding *Counterman's* impact").  Nor does the absence of a case applying *Counterman* in the precise context presented here defeat clearly established law.  The Supreme Court has held that officials may be on notice that their conduct is unlawful even in novel factual circumstances where existing precedent applies with "obvious clarity" to the conduct at issue.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

---

[9]  The Court is not persuaded by Defendants' reliance on *Sanchez v. Guzman*, 105 F.4th 1285, 1293 (10th Cir. 2024), to suggest that "[e]ven seminal Supreme Court cases on particular points of law do not by themselves create clearly established law outside an obvious case."  Reply at 2 (citation modified).  As the decision explains, that observation arises in the context of Fourth Amendment excessive force cases where landmark cases like *Tennessee v. Garner* and *Graham v. Connor* are cast at a high level of generality and do not necessarily provide guidance for each unique setting in which an officer is required to make "split-second decisions." *Sanchez v. Guzman*, 105 F.4th 1285, 1293 (10th Cir. 2024).  Thus, *Sanchez* does not create a bright line rule that Supreme Court precedent cannot clearly establish the law—particularly where, as is the case here, the violation is not the product of a split-second decision.

Accordingly, because Plaintiff's allegations in the Amended Complaint satisfy both prongs of the qualified immunity test, her free-speech claim survives Defendants' Motion to Dismiss.

**(b)    Count II: Vagueness**

Plaintiff's second § 1983 claim alleges the University's Student Rights and Responsibilities Code is unconstitutionally vague as applied and therefore violates the First and Fourteenth Amendments.  Under the Due Process Clause of the Fourteenth Amendment, a regulation is impermissibly vague only if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  Vague provisions are particularly problematic where they regulate speech protected by the First Amendment because uncertainty may cause individuals to "steer far wider of the unlawful zone" and refrain from lawful expression.  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see also id.* at 253–54.  Nonetheless, absolute precision is not required; rather, a regulation is sufficiently definite if its meaning can be understood through common usage and ordinary interpretation.  *See United States v. Williams*, 553 U.S. 285, 304 (2008).  Courts also consider whether the challenged language incorporates well-established legal concepts that provide objective guidance.  *Id.*

Defendant argues the Code "squarely meets this standard."  Mot. to Dismiss at 17.  The Court agrees.  Here, the Code prohibits "threatening behavior," which is defined as:

> A serious expression of intent to commit an act of unlawful violence against a particular individual, identifiable group, or damage to property. The threatening violence, including intimidation, causes reasonable fear of injury to the health or safety of any person, group, or property.

Ex. 1; Ex. 3; Amend. Compl. ¶ 57.  That definition aligns with the Supreme Court's articulation of "true threats" in *Counterman* nearly verbatim.  600 U.S. at 74 ("True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence.") (citation

modified). Because the Code incorporates this established legal standard, it provides meaningful notice of the type of speech it prohibits.  The requirement that the statement constitute a "serious expression of intent" to commit "unlawful violence" significantly narrows the rule's scope and distinguishes punishable threats from protected rhetoric, exaggeration, or political hyperbole.  *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969).

Plaintiff's concern is twofold.  First, she alleges the Code failed to provide notice that "her statements made in confidence to 988 when seeking mental health counseling would constitute a violation."  Amend. Compl. ¶¶ 54–61.  Plaintiff's focus on the expected confidentiality of her statements, however, is misguided.  For vagueness purposes, the relevant question is whether a student of ordinary intelligence would understand that such statements, whether shared in confidence or not, could violate the Code.  Given the rule's incorporation of the well-established "true threat" standard, the Court concludes the Code provides students with sufficient notice of that boundary.

Second, Plaintiff argues the Code has "such a broad and unforeseeable scope" that it invites discriminatory enforcement. *See id.* ¶ 56.  The Court disagrees.  The Code contains several objective limitations: the threat must involve unlawful violence, it must be directed at a particular individual, identifiable group, or property, and it must be serious enough to cause reasonable fear of harm.  Importantly, the Code does not regulate speech based on its viewpoint or general offensiveness; it targets only speech that communicates a genuine threat of violence.  In short, a student of ordinary intelligence reading the provision would understand that the Code prohibits statements that seriously express an intent to commit unlawful violence against a person, group, or property.

Because the facts, taken as true, do not make out a violation of a constitutional right under the first prong of the qualified immunity test, the Court dismisses Plaintiff's Count II claim with prejudice. *Knight*, 749 F.3d at 1190–91.

### (c)    Count III: Procedural Due Process

Plaintiff's third § 1983 claim alleges she had a protected liberty or property interest in her right to pursue higher education and professional licensure and she was deprived of that interest without constitutionally adequate procedures. *Id.* at ¶¶ 62-69. This claim does not survive a motion to dismiss under the first prong of the qualified immunity test.

The Supreme Court's decision in *Goss v. Lopez,* 419 U.S. 565 (1975) sets the standard for procedural due process owed to students facing short-term school suspensions. Under *Goss*, if the suspension is ten days or less, the student must be given "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss,* 419 U.S. at 581, 95 S.Ct. 729. It is undeniable that Plaintiff received at least the minimum due process required by *Goss*. Ex. 3 (written notice); Ex. 14 (opportunity to be heard).

The *Goss* court further explained, however, that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Goss,* 419 U.S at 584. Although *Goss* does not identify the requisite "formal procedures" with specificity, this is not a close case. As described above, Plaintiff received extensive procedural protections, including a three and a half hour formal hearing that involved an opportunity to examine witnesses, introduce evidence subject to various evidentiary protections, representation by counsel, and a multi-level appeal process. Mot. to Dismiss at 18–19; Amend. Compl. ¶¶ 36–37; *see Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) (citing the First and Sixth Circuits and

casting doubt on whether students are even entitled to the safeguards Plaintiff was afforded such as the right to counsel and the right to cross-examine witnesses).

Although some hearsay evidence was admitted, Resp. at 27–28, Plaintiff was permitted to testify on her own behalf and "[a]ll that is necessary" to satisfy due process "is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Mathews,* 424 U.S. 319, 349 (1976) (quoting *Goldberg v. Kelly,* 397 U.S. 254, 268–69 (1970)).  Accordingly, the Court concludes Plaintiff received ample procedural safeguards, and her third cause of action is therefore dismissed with prejudice.  *Knight,* 749 F.3d at 1190–91.

## IV.     <u>Analysis: Plaintiff's discrimination claim</u>

The Court next addresses Plaintiff's claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination on the basis of disability by programs or activities receiving federal financial assistance.

To state a claim, plaintiff must plausibly allege: (1) she is disabled; (2) she is otherwise qualified to participate in the program; and (3) she was excluded from participation in, denied the benefits of, or subjected to discrimination under the program solely by reason of her disability. 29 U.S.C. § 794(a); *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008).  The parties do not dispute the first element because Plaintiff was registered with the University's disability accommodations office due to diagnoses of generalized anxiety disorder, major depressive disorder, and ADHD.  Amend. Compl. ¶ 1; Mot. to Dismiss at 22; Resp. at 30.

Defendants argue Plaintiff failed to establish the second and third elements.  Because the Court agrees that the Amended Complaint fails to satisfy the third element, the Court declines to address the second.  In sum, the Amended Complaint alleges each of the Defendants discriminated

against Plaintiff because of her disabilities.  First, Mr. Schofield "disclosed Plaintiff's mental health diagnoses" to the 988 operator.  Amend. Compl. ¶ 12.  Second, Ms. Cavazos stated during her opening statement at the disciplinary hearing that she has "to deal with threats to our campus community more often than I'd like to, and they are typically tied to a person experiencing mental distress."  *Id.* ¶ 25.[10]  Third, the University failed to provide reasonable accommodations and penalized Plaintiff for "behavior that was a manifestation of her disabilities." *Id.* ¶ 74.  And fourth, Mr. Surratt was aware of all these facts and still chose to affirm the panel's decision. *Id.* ¶¶ 36–37.

Even accepting these allegations as true, the Amended Complaint does not plausibly allege that Defendants acted solely by reason of Plaintiff's disabilities.  To the contrary, Plaintiff's own allegations establish that the disciplinary action was based on a legitimate, non-discriminatory basis because the hearing panel's conclusion focused on her "threatening behavior" that violated the University's Student Rights and Responsibilities Code.  *Id.* ¶¶ 22; Ex. 3.  Moreover, Plaintiff's allegation that she was penalized for a "manifestation" of her disability is dispositive.  Amend. Compl.  ¶ 74.  The Rehabilitation Act does not prohibit an institution from disciplining misconduct simply because it may be related to a disability.  As the Tenth Circuit explained in *Williams v. Widnall*, an official may take action based on "egregious behavior," even when that behavior is alleged to be "an attribute caused by the handicap and not the handicap itself."  79 F.3d 1003, 1006–07 (10th Cir. 1996) (upholding termination of an employee despite employee's claim that his threats were a direct result of his disability).

---

[10]  Immediately following this statement, Ms. Cavazos also elaborated that it "is standard for me to ensure a time of separation happens for the involved student to, A, get the necessary treatment and help that they need, B, have adequate time to reflect on their actions and how it affected and impacted others, and C, provide time for the person, group of individuals, or office to get back into their normal routines."  Ex. 14 at 20–21.

Because the Amended Complaint, even when viewed in the light most favorable to Plaintiff, does not plausibly allege that Defendants discriminated against her solely by reason of her disability, Plaintiff's fourth cause of action is dismissed with prejudice. *Knight*, 749 F.3d at 1190–91.

V.    <u>**Conclusion**</u>

Based on the foregoing, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss [Doc. No. 36]. Plaintiff's § 1983 claims alleged in Counts II and III, and Plaintiff's Rehabilitation Act claim alleged in Count IV are dismissed with prejudice. Plaintiff's Count I claim against the University is likewise dismissed with prejudice. Additionally, the Court FINDS that Plaintiff lacks standing, based on the facts alleged in the Amended Complaint, to seek relief restraining the University Defendants from pursuing future disciplinary action against Plaintiff based on her prior statements to the 988 operators. Thus, Plaintiff's only surviving claim is her Count I claim against: (a) the University Defendants sued in their official capacities, but only to the extent Plaintiff seeks prospective injunctive relief; and (b) the Individual Defendants sued in their individual capacities.

IT IS SO ORDERED this 13th day of March, 2026.

BERNARD M. JONES, II
UNITED STATES DISTRICT JUDGE