**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

MEGAN HSIEH,                              )
                                          )
              Plaintiff,                  )
                                          )
v.                                        )        Case No. CIV-25-1160-J
                                          )
STATE OF OKLAHOMA ex rel.,                )
THE BOARD OF REGENTS for the              )
UNIVERSITY OF OKLAHOMA, et al.,           )
                                          )
              Defendants.                 )

<u>**ORDER**</u>

This case arises out of Plaintiff's one-year suspension from the University of Oklahoma

Health Sciences Center based on allegations that she made threatening statements while

experiencing a mental health crisis.  In October 2025 the Court denied Plaintiff's request for a

Temporary Restraining Order, in part, because Plaintiff could not show irreparable harm since she

had not yet applied for residency and her injury was entirely theoretical [Doc. No. 16].  As set forth

in the Order on Defendants' Motion to Dismiss [Doc. No. 47], issued contemporaneously with this

Order [Doc. No. 48], the Court determined: (a) Plaintiff's only surviving claim is her First

Amendment claim against (i) David A. Surratt and Kalyn Cavazos sued in their official capacities

(the University Defendants), but only to the extent Plaintiff seeks prospective injunctive relief and

(ii) David A. Surratt, Kalyn Cavazos, and Terry Schofield sued in their individual capacities (the

Individual Defendants); and (b) Plaintiff lacks standing, based on the facts alleged in the Amended

Complaint, to seek relief restraining the University Defendants from pursuing future disciplinary

action against Plaintiff based on her prior statements to the 988 operators.

Now before the Court is Plaintiff's Motion for Preliminary Injunction [Doc. No. 43] and

Brief in Support [Doc. No. 44] (Mot. for Prelim. Inj.), filed February 8, 2026.  Defendants filed a

response [Doc. No. 45] (Resp.), and Plaintiff replied [Doc. No. 46] (Reply).  For the reasons set forth below, Plaintiff's Motion for Preliminary Injunction is DENIED.

## I.  **Background**

In 2024, Plaintiff experienced a mental health crisis, prompting her to contact the 988 Suicide and Crisis Lifeline, which provides "free and confidential emotional support to people in suicidal crisis or emotional distress."  Amend. Compl. ¶¶ 1, 5–6.  In her phone calls with the 988 operators on April 27 and May 1, Plaintiff made numerous statements that are the central focus of this litigation.[1]  For example, she stated: (a) she "wished that [Kate Stanton, an administrator at the University] would die" and that she wanted other administrative staff at the medical school to die; (b) "I am so tired and done; I want to rip my head off" and "leave a note to the news at the school and let them know that it's this place's fault and destroy the school in the process;" (c) "I want to end it all at the school, five minutes before post it to the news, tell other med schools, and take the administration with me;" (d) "[I want to] yeet off the planet and yeet them [the administrators] too;" and (e) "I want her to pay in one way or another, and I want the school to pay in one way or another."  *Id.* ¶¶ 8, 32, 33; Amend. Compl. Ex. 9.

During the April 27 phone call, the 988 operator was "able to stabilize" Plaintiff and create a "safety plan for her," so that by the end of the call she was "not making any more threatening statements or wanting to hurt herself."  Amend. Compl. Ex. 5 at 3:8–4:12; Amend. Compl. Ex. 6 at 5:16–6:3.  Although the 988 operator thought it was "kind of a 51/50," meaning it was a close call, he elected to warn the University about Plaintiff's statements.  Amend. Compl. ¶ 8.  For

---

[1]  988 phone calls are generally recorded.  Plaintiff attached numerous transcripts to the Amended Complaint, but neither party has presented the Court with a transcript of Plaintiff's original phone call with 988 on April 27.  *See* Amend. Compl. ¶¶ 8–9.  The parties dispute Plaintiff's precise words in her April 27 phone call and the context surrounding her statements in the May 1 phone call.  *Id.*

example, the 988 operator explained "she's not an immediate threat to herself or anybody else" and "even though we don't think that she was serious about the threats, we just don't want to leave any stone unturned. We dot the I's and cross the T's." *Id.*; Amend. Compl. Ex. 6 at 4–5.  He also noted Plaintiff lacked the means to carry out any harm and that her statements were "just more of her expression of . . . the episode that she was having." Amend. Compl. Ex. 6 at 11:18–12:4 ("She did report she had no means . . . . [S]he hadn't really formed a plan."); Amend. Compl. ¶¶ 7–11, 14; Amend. Compl. Ex. 9 at 2:6–19; 5:2–17; 12:10–22.

By May 1, 2024, Terry Schofield, the deputy chief of police with the University of Oklahoma, agreed that even though "saying I wish someone was dead . . . is ugly and not right to say," it is not a threat, "it's not hate speech, it's free speech."  Amend. Compl. Ex. 8 at 10:21–11:7. Nonetheless, Mr. Schofield asked 988 to follow up with Plaintiff, explaining "we don't want her to know that you guys called us and told us what she said" because that could dissuade Plaintiff from relying on 988 during a future crisis.  *Id.* at 6:6–24; 18:21–19:8.  In the follow-up call, the operator expressed sympathy for Plaintiff's situation and inquired: "So, with all that, it hasn't brought you any, you know, harmful thoughts or anything like that?" Amend. Compl. Ex. 9 at 8– 9.  To which Plaintiff replied: "Sure as hell did the day that I called.  No.  Like clearly like nothing to do it with. But . . . ." *Id.*

On May 7, 2024, Kalyn Cavazos, the Assistant Dean of Students & Director of Student Conduct, sent Plaintiff a letter explaining that she was expelled because her statements to the 988 operator violated the University's Student Rights and Responsibilities Code, which prohibits threatening behavior.  Amend. Compl. Ex. 3; Amend. Compl. ¶ 57.  Plaintiff appealed the decision and was granted a formal hearing before a three-person panel that lasted approximately three and a half hours.  Amend. Compl. ¶¶ 25, 35, 37; Ex. 2.  At the hearing, Plaintiff testified that she never

told 988 that she wanted to kill or harm Ms. Stanton, that she had no plan and no access to any means of harm (e.g., a gun), and that she was incapable of getting up from the floor. Amend. Compl. ¶¶ 28, 31. She also explained that by "destroy" she meant "I really wanted them to know that . . . if I were to hurt myself . . . it was because of all these pressures from school;" that when she used the phrase "yeet off the planet and yeet them all too" she meant she wanted "to let the news and medical schools know that it's because of this place;" and when she said she wanted Stanton "to pay in one way or another" she really meant that she wanted Stanton "to lose her career, lose her reputation, like I want to expose her." *Id.* ¶ 28, 32–33.

Plaintiff has already completed her one-year suspension but is currently proceeding through a residency application and has expressed concern regarding the possible stigma she will face if the suspension remains on her record. Amend. Compl. ¶ 38–39; Mot. for Prelim. Inj. at 4–5. Thus, Plaintiff asserts a claim under 42 U.S.C. § 1983 for a First Amendment violation, alleging she was improperly disciplined due to her statements to the confidential 988 Suicide Crisis Lifeline. Plaintiff seeks injunctive relief requiring the University to: (1) expunge and permanently remove all documented notations, records, and any other materials related to her disciplinary incident and suspension from her educational and personal records; (2) refrain from reporting the suspension on Plaintiff's application materials for residency; and (3) recharacterize Plaintiff's one-year suspension as an excused leave of absence. Amend. Compl. ¶ 79; [Doc. No. 43 at 2].

## II.  <u>Legal Standard</u>

Federal Rule of Civil Procedure 65 authorizes a district court to issue a preliminary injunction. *See* Fed. R. Civ. P. 65(a). A preliminary injunction is an "extraordinary" equitable remedy that is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt.*

*Consultants, Inc.,* 883 F.2d 886, 888–89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established."). Its purpose "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing that "[1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010).[2] The issuance of a preliminary injunction rests "within the sound discretion of the trial court." *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986).

## III.  Analysis

### A.  Likelihood of Success on the Merits

In its Order addressing Defendants' Motion to Dismiss [Doc. No. 47], the Court recognized that Plaintiff's First Amendment claim presented a "close case," yet declined to dismiss it at the pleading stage, noting that all well-pled factual allegations must be accepted as true and viewed in the light most favorable to the non-moving party. While this standard is appropriate for evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the standard is markedly higher when considering a motion for a preliminary injunction. At this stage, the plaintiff must

---

[2] Defendants argue for a "heavier burden" or "strong showing" standard because the injunctive relief Plaintiff seeks qualifies as a "disfavored" injunction that: (1) mandates action; (2) changes the status quo; or (3) grants all the relief the moving party could expect to win from trial. Resp. at 2. The Court declines to apply the heightened standard, however, because the Court determines Plaintiff cannot meet even the more relaxed standard.

establish more than well-pled allegations; she must demonstrate a likelihood of success on the merits. *See Winter* 555 U.S. at 20; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, "[i]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (citation modified).

At issue in this case is whether Plaintiff's statements to the 988 operators qualify as a true threat. Specifically, whether the Defendants can show Plaintiff's subjective mental state was reckless—that is, that she "consciously disregarded a substantial risk that [her] communications would be viewed as threatening violence." *Counterman v. Colorado*, 600 U.S. 66, 69, 77–79 (2023). Here, the evidence weighs against Plaintiff's likelihood of success. Plaintiff's own statements during the May 1 follow-up call, in which she admitted that she "[s]ure as hell did" experience "harmful thoughts or anything like that" during her first phone call, directly contradict her testimony at the disciplinary hearing. Amend. Compl. Ex. 9 at 8–9. This inconsistency calls into question whether she possessed the requisite intent at the time she made the statements to the 988 operator during the April 27 phone call.

Second, Defendants raise an alternative theory that the University "possess[es] an inherent right to discipline students." Resp. at 4. Courts have repeatedly held that speech that materially disrupts the functioning of a school is not protected under the First Amendment. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969) (student expression may be limited if it materially disrupts school operations); *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 188 (2021) (noting "several types of off-campus behavior that may call for school regulation" including "threats aimed at teachers or other students"); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975). Here, it is undisputed that Plaintiff's speech caused tangible disruption.

Nonessential staff were sent home, access to the Student Union Building was restricted, and an optional graduation event for seniors was cancelled. Amend. Compl. ¶ 20; Resp. at 4.

Taken together, these facts indicate that Plaintiff faces significant challenges in establishing a likelihood of success on the merits, a threshold requirement for preliminary injunctive relief. Thus, this factor favors Defendants.

### B. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976). As explained in the preceding section, however, Plaintiff has failed to demonstrate the requisite likelihood of success on her free speech claim. As a result, she is not entitled to a presumption of irreparable injury. *Schrier v. Univ. of Co.*, 477 F.3d 1253, 1266 (10th Cir. 2005). Nonetheless, a plaintiff satisfies the irreparable harm requirement by showing "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1210 (10th Cir.2009) (citation modified). Purely speculative harm will not suffice, but "[a] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative and will be held to have satisfied this burden." *Id.* (citation modified).

As a preliminary matter, the Court agrees with Plaintiff that her purported injury is imminent. Mot. for Prelim. Inj. at 6. It is undisputed that Plaintiff seeks to apply for residency positions in the Supplemental Offers and Acceptance Program (SOAP) that will occur during the week of March 16, 2026. [Doc. No. 43 at 1]. The Court also agrees that the irreparable harm factor tips in favor of Plaintiff, but it is a close case for a few reasons. The starting point is strong precedent in Plaintiff's favor. Both the United States Supreme Court and this Court have recognized a suspension could "seriously damage" a student's reputation and "interfere with later

opportunities for higher education and employment." *See Goss v. Lopez*, 419 U.S. 565, 567–71, 584; *Ritter v. Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620 (W.D. Okla. May 6, 2016); *J.C. v. Laverne Pub. Sch. Dist.*, No. CIV-18-197-M, 2018 WL 1661863 (W.D. Okla. Apr. 5, 2018). It is important, however, to situate this general rule within the context of how Plaintiff's suspension will be reported in her residency application.

To begin, the Court is not convinced that Plaintiff will suffer "permanent exclusion from her profession" or that she "***cannot*** realistically apply" for a residency program because of her suspension. Mot. for Prelim. Inj. at 4, 23. Defendants acknowledge that the suspension notation "may affect Plaintiff's residency prospects to some degree," Resp. at 16, and Plaintiff has presented compelling evidence suggesting it has already made certain volunteer opportunities more difficult to obtain, and that residency programs can apply a built-in filter to screen out her application. Mot. for Prelim. Inj. at 4–5, Exs. 1, 5, 7. But a reduced prospect does not equate to a categorical bar from pursuing her chosen profession.

Notwithstanding the possibility of reduced prospects, the Court also considers how that information will appear in the residency application process and how programs are likely to evaluate it. Plaintiff's application packet includes components authored by Plaintiff (e.g., Mot. for Prelim. Inj. Ex. 2) and components authored by the University (e.g., Mot. for Prelim. Inj. Exs. 3–4). *See also* Resp. at 12 n.3. In the student-authored portion, Plaintiff must disclose whether she has had a professionalism sanction or any other adverse action by her school, but she is also given the opportunity to "explain the reason, timeframe, what steps [she] took to address it, and what [she] learned from it." Ex. 2. Evidence in the record further indicates that "residency programs conduct holistic reviews of applicants," considering numerous factors including "what the applicant has done since the event in question." Resp. Ex. 3 ¶¶ 4–5.

The University-authored materials include the student's transcript and the so-called "Dean's Letter" or "Medical Student Performance Evaluation Letter." Resp. at 12 n.3. The transcript reflects a gap in enrollment from May 2024 to May 2025 but does not provide any substantive explanation for the gap. Resp. Ex. 1 at 2. In the Dean's Letter, the University is asked two questions: (1) Identify any "[e]xtensions, leaves of absence, breaks in the educational program" and (2) Was this student the recipient of any adverse actions by the medical school? Mot. for Prelim. Inj. Ex. 4. The University's answer to both is identical: "Yes; Megan was suspended from the program for one year. She has successfully completed all requirements and has performed well since her return to the program." *Id.* As Defendants point out, this answer makes no reference to "threatening behavior" and therefore leaves it up to Plaintiff to contextualize the events leading to her suspension. *See* Resp. at 12.

Because Plaintiff's application may be screened out by some residency programs and Courts have acknowledged a suspension notation can create irreparable harm, the Court determines this factor weighs in favor of Plaintiff. However, the Court recognizes the University-authored portion of the application states Plaintiff has "performed well since her return to the program," makes no reference to the underlying reasons for her suspension, and instead allows Plaintiff to remove the sting by supplying the details, including the steps she took to address it, the lessons she learned, and how the experience might strengthen Plaintiff's ability to serve her patients.

## C.  Balance of the Equities & Public Policy

Here, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); Mot. for Prelim. Inj. at 24; Resp. at 21. The Court determines both factors favor the University because Plaintiff's requested injunction would require far more than a simple record edit. Removing the disciplinary notation and representing Plaintiff's leave as excused would

effectively compel the University to certify to residency programs that no disciplinary action occurred—information that would be incomplete and misleading because a disciplinary proceeding, violation finding, and suspension did in fact occur. *See* Resp. at 21–22, 24. Such an order would force the University to provide inaccurate facts relied upon by residency programs in decisions affecting patient care and public safety. *Id.* It would also risk lasting reputational harm to the University and undermine the credibility of its communications for all future applicants, harming other students who depend on the integrity of those records. Resp. Ex. 3 ¶ 10 (suggesting that if Plaintiff ultimately does not prevail, "the University would need to contact every program that received the incomplete record and correct it").

Plaintiff's countervailing concern is that students might be discouraged from seeking mental health support if they believe statements made to a crisis hotline could later result in discipline. Mot. for Prelim. Inj. at 24. While the Court takes that concern seriously, that speculative possibility does not outweigh the concrete harms that would result from compelling the University to provide incomplete or misleading information to residency programs and the broader medical profession. The public interest is better served by preserving the accuracy and reliability of institutional records while the Court resolves the underlying constitutional questions on a full record.

## IV.  <u>Conclusion</u>

Based on the foregoing, the Court DENIES Plaintiff's Motion for Preliminary Injunction [Doc. Nos. 43–44].

IT IS SO ORDERED this 13th day of March, 2026.

BERNARD M. JONES, II
UNITED STATES DISTRICT JUDGE